UNION NATIONAL BANK and Edmound
Dale LEIGH *v.* Alice E. LEIGH

73-287 509 S.W. 2d 539

Opinion delivered May 13, 1974
[Rehearing denied June 17, 1974.]

532

 █

*Smith, Williams, Friday, Eldredge & Clark*, by: *George Pike, Jr.*, for appellants.

*Warner & Smith*, by: *J. H. Evans*, for appellee.

GEORGE ROSE SMITH, Justice. This is a will contest. The testator, William W. Leigh, died in Little Rock in 1972, at the age of 87. His widow, the appellee Alice E. Leigh, offered for probate a will that had been executed by her husband more than six years earlier, on September 6, 1966. The probate of that will was resisted, on the related grounds of undue influence and lack of testamentary capacity, by the Union National Bank, which Mr. Leigh had named as his executor in an earlier will, and by Edmond Dale Leigh, the decedent's only child (by an earlier marriage). After an extended trial involving much testimony and many exhibits, the probate judge handed down a written opinion sustaining the validity of the challenged will. The only question here is whether the trial court's judgment is clearly against the weight of the evidence. Our study of the case convinces us that the trial court was right.

Opposing counsel are so nearly in agreement about the controlling principles of law that we hardly need to refer to our prior decisions. Although the burden of proving the invalidity of the will was upon the contestants, Alice Leigh's confidential relationship with her husband cast upon her the burden of overcoming a rebuttable presumption of undue influence. *Orr* v. *Love*, 255 Ark. 505, 283 S.W. 2d 667 (1955). We do not, however, regard her participation in the drafting and execution of the will as having been so dominating or so overpowering as to call for proof beyond a reasonable doubt — a test that was mentioned in *McDaniel* v. *Crosby*, 19 Ark. 533 (1858).

Mr. Leigh was admitted to a Little Rock nursing home on January 11, 1966, and executed the questioned will almost

eight months later, on September 6. Every factual aspect of the case really turns upon the events that took place between those two dates. Indeed, there is so little conflict in the testimony about the testator's earlier life that we may pass quickly over that phase of the proof.

Mr. Leigh was born in 1885. He was engaged in the insurance business in Little Rock throughout most of his life, finally retiring in 1963. At the age of 55 he married his first wife, Edith Dale, in 1940. Their only child, Edmond Dale Leigh, was born in 1942. Mrs. Leigh died ten years later. In 1955 Mr. Leigh married the appellee, a woman 23 years younger than he, who had children by an earlier marriage. There is no indication of any friction or dissension while Edmond Dale was growing up in the home of his father and stepmother. Edmond Dale graduated from the University of Pennsylvania in 1963 and from the University of Oklahoma law school on June 1, 1966. Since 1965 he has lived in Oklahoma City, where he practices law. He has been married twice and has no children.

The appellants offered for probate a will executed by Mr. Leigh on September 30, 1964. That will was drafted by H. B. Stubblefield, who had been the testator's attorney since 1931. It divided the testator's property equally between his wife and son. On September 10, 1965, the testator signed a codicil, also drawn by Stubblefield, changing the executor from A. S. Fox, an accountant, to the appellant bank. All the parties admit the competency of Mr. Leigh when he executed that will in September, 1964, and the codicil in September, 1965. From that point on, however, there is much conflict in the testimony. We set forth what we regard as its essential substance, without stopping to analyse minor conflicts that would not be determinative no matter which way they were resolved.

In December, 1965, Mr. Leigh was suffering from severe headaches. Drugs were prescribed; but Mr. Leigh, by selecting his own dosages, took them in such excessive quantities that his health and clarity of mind were affected. His physicians, Dr. Smith and Dr. Levy, decided that their patient should be placed in a nursing home (no hospital accommodations being immediately available), where the administration of drugs could be carefully supervised.

Mr. Leigh was admitted to the Arkansas Nursing Home, in Little Rock, on January 11, 1966. According to his doctors he was suffering from generalized arteriosclerois with recurrent headaches—a condition that had been constant for four years. He also had a possible acute brain syndrome from drugs and moderate to marked senile change. The doctors noted in their records that the patient was markedly improved by January 22 and still more improved by January 26. Apparently the improvements were the result of the patient's reduced intake of drugs.

Edmond Dale came from Oklahoma to visit his father on January 20, 21 and 22. He found his father so weakened and confused that he could not carry on an extended conversation. He would stop in the middle of a sentence and say something like: "I'm tired. Why don't you come back later?" Edmond Dale also said that his father referred to him as Gilbert, which was the name of Mr. Leigh's nephew.

Edmond Dale decided to call in another physician and selected Dr. Morris, a specialist in geriatrics. Dr. Morris, who had known Mr. Leigh previously, examined him on January 22. Dr. Morris noted that Mr. Leigh seemed oriented throughout the examination. The patient could carry on a conversation; his speech was clear. Dr. Morris said that Mr. Leigh had moderately advanced arteriosclerosis, which ordinarily includes some brain damage. He added, however, that he and others in the courtroom had some degree of arteriosclerosis and brain damage—conditions that are suffered by most people in their seventies and eighties. Dr. Morris's testimony is significant, for, although he was selected by Edmond Dale and appeared in his behalf, the doctor did not say at any time that Mr. Leigh was not mentally competent to make a will.

On January 16 Mr. Leigh's attorney, Stubblefield, learned that his client was in a nursing home. On January 17 Mrs. Leigh called Stubblefield and asked him to prepare a deed conveying certain of her husband's property to her. Stubblefield said that he would have to talk to Mr. Leigh first. Mr. Leigh also called and asked Stubblefield to come out, but when the lawyer got there his client did not remember having called him. Stubblefield visited with Mr. Leigh then and continued to call upon him at the nursing

home, not less often than every two weeks, from January, 1966, until September, 1968.

Mr. Stubblefield was actually the only witness who testified positively that the testator was incapable of making a will. It was Stubblefield's opinion that Mr. Leigh's condition became progressively worse after January, 1966, that the will of Alice Leigh had supplanted the will of her husband, and that Mr. Leigh was not mentally competent to make a will at any time after Stubblefield first saw him in January.

The sincerity of Stubblefield's opinion is not open to doubt, but the great mass of the testimony points in the opposite direction. Dr. Levy, the testator's personal physician and therefore a key witness, testified that his patient was in fairly good general physical condition at the time of his admission to the nursing home. The effects of Mr. Leigh's excessive use of drugs cleared up. The doctors decided to discontinue the use of several drugs, beginning on July 27, 1966. The patient's blood pressure dropped, and his headaches ceased—improvements that continued until October (after the execution of the will in September). The records made by the nurses are to the same effect. Initially those records stated that the patient was confused, but there is no reference to confusion from July 8, 1966, until August 7, 1967. There are frequent notations that the patient was ambulatory, that he went to the dining room for meals, that he walked around outside the nursing home, and that he went riding with his wife.

Mr. Leigh executed two wills in 1966, after entering the nursing home. Both were drafted by Edgar Bethell, a respected member of the Fort Smith bar, whom Alice Leigh employed because she and Bethell's mother were friends. The earlier will, signed on February 25, 1966, was substantially similar to the 1964 will drawn by Mr. Stubblefield, leaving half the estate to Alice Leigh and half to Edmond Dale Leigh. That will was witnessed by John H. Willingham, who was a business associate of the testator, and by Dr. Levy, the testator's physician. Although the appellants contend that Mr. Leigh was then incapable of making a will, the testimony of Bethell, Willingham, and Dr. Levy is highly persuasive evidence to the contrary.

The second will, now in issue, was executed on September 6, 1966, and was witnessed by Dr. Levy and by George W. Dickinson, a close business associate of Mr. Leigh's who visited him frequently at the nursing home. Mr. Leigh himself telephoned Dickinson and asked him to come to Dr. Levy's office (not at the nursing home) and witness the will. Both witnesses testified clearly and positively that Mr. Leigh appeared to be capable of executing the will. Mrs. Leigh was not present at the execution of the will, which was supervised by Mr. Bethell.

The appellants' strongest argument—and one which we have studied carefully—is that the September will made an unnatural disposition of the testator's estate, in that all the property was left to Alice Leigh, to the exclusion of the testator's only child. Of course that fact alone is not of controlling weight, for counsel concede that under many decisions of this court a person is free to dispose of his estate in any way that he chooses.

As a matter of fact, Mr. Leigh's disposition of his property was not really as unnatural as counsel would have us hold. The testator's estate, when he entered the nursing home, was worth about a million dollars. The challenged will, after leaving all the estate to Alice Leigh, then left the entire estate to Edmond Dale if Alice predeceased the testator, and continued with this language: "I desire to note, in connection with this disposition of my Estate that I have, prior to this time, given my son a substantial share of my estate, and his means have been augmented by inheritance from other relatives, as well as by prudent investment on his part. It is my intent and purpose to insure that my wife, who has been so devoted and faithful in her attention to my needs, shall want for nothing within my means to provide."

The declarations were true. Edmond Dale testified that his personal holdings, acquired by inheritance, were worth about half a million dollars. His father had given him $30,000 directly. In addition, Mr. Leigh had given his first wife—Edmond Dale's mother—property worth $250,000, which she in turn bequeathed to Edmond Dale. He had also received substantial inheritances from other relatives. Moreover, the proof shows that after Mr. Leigh entered the nursing home his wife was with almost every day, from reasonably early in the mor-

ning until after the two had supper together late in the afternoon. That constant companionship continued long after the execution of the September 6 will, until Mr. Leigh's mind finally failed in 1969. By contrast, Edmond Dale was living away from Arkansas and visited his father only infrequently during the same period of time.

Counsel for the appellants also stress the fact that Mr. Leigh had given most of his property to Alice Leigh at various times between his admission to the nursing home and the execution of the will in September. Certainly those gifts could have been taken to indicate undue influence; but the probate judge, who had the great advantage of observing the parties and the witnesses, did not so find. We have already noted that Mr. Leigh gave his first wife property worth a quarter of a million dollars, which we think to be of significant importance. Moreover, the gifts to Alice Leigh were not made surreptitiously. When real estate was involved the deeds were promptly placed upon the public records. All the gifts were reported in federal gift tax returns, prepared by Mr. Leigh's certified public accountant and duly filed. (We are told that the validity of those gifts is being challenged in a separate suit, but counsel recognize that the affirmance of the judgment in the case at hand will moot that case.)

In conclusion, we observe that the contestants of the will in controversy were confronted with a difficult task in their attempt to prove testamentary incapacity. That is, they take the position that Mr. Leigh had full testamentary capacity when he executed a will in September, 1964, and a codicil to that will in September, 1965. But they then had the burden of proving that the testator's mind had failed before the execution of the will now in issue, in September, 1966. If there had been any such abrupt cessation of testamentary capacity, we should expect it to be reflected in the testimony of the two doctors, Dr. Morris and Dr. Levy. There is, however, no such testimony. To the contrary, the evidence given by the medical expert witnesses is essentially favorable to the validity of the will. We find no basis for declaring that the probate judge's decision is contrary to the weight of the evidence.

Counsel for the appellee have re-abstracted all the testimony, upon the theory that the appellants' abstract is incomplete, and ask reimbursement for the costs involved. We

deny that motion, because a complete re-abstracting of the record was not necessary for a fair presentation of the case, even if the asserted deficiencies in the appellants' abstract be admitted.

Affirmed.

BYRD, J., dissents.