Douglas EASTERLING, Appellant *v.* Mark WEEDMAN, Jr.,
Appellee/Cross-Appellant *v.* Metropolitan Life Insurance
Company and Financial Benefit Life Insurance Company,
Cross-Appellees

CA 95-14 922 S.W.2d 735

Court of Appeals of Arkansas
Division II
Opinion delivered May 29, 1996

*Barber, McCaskill, Amsler, Jones & Hale, P.A.*, by: *Richard C. Kalkbrenner* and *Scott M. Strauss*, for appellant.

*Elrod Law Firm*, by: *John R. Elrod* and *Ruth A. Wisener*, for appellee/cross-appellant.

*Alvin Pasternak, Christine Meyers*, and *Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by: *Marshall S. Ney*, for cross-appellee Metropolitan Life Ins. Co.

*Robinson, Staley & Marshall*, by: *Robert L. Robinson, Jr.*, and *Patricia Stanley Luppen*, for cross-appellee Financial Benefit Life Ins. Co.

WENDELL L. GRIFFEN, Judge. Following a trial on May 25 and 26, 1994, in the Pulaski Circuit Court, Fifth Division, a jury returned verdicts upon written interrogatories that Mark Weedman, Sr., deceased, intended that his son Mark Weedman, Jr., be the beneficiary of a $200,000 annuity issued by Financial Benefit Life Insurance Company, and that Douglas Easterling, the insurance agent who sold the annuity, negligently failed to implement that intent. The jury also found that Mark Weedman, Jr., was entitled to recover $225,692.04 in damages from Easterling because of his negligence concerning the Financial Benefit Life Insurance annuity. The jury further found that Mark Weedman, Sr., intended for Mark Weedman, Jr., to be the beneficiary of a $300,000 annuity issued by Metropolitan Life Insurance Company, and that Douglas Easterling had failed to implement that intent. The jury assessed Weedman's damages for that negligence at $332,718.42. The trial court entered judgment in favor of Weedman and against Easterling for $558,410.46 in damages, prejudgment interest of $120,058.15, plus court costs of $45.00.

Easterling has appealed from the judgment entered against him and in favor of Weedman upon the verdicts, and contends that the trial judge erred by excluding proffered testimony concerning the decedent's intent to give Weedman anything. Easterling also asserts that the trial judge erred by admitting into evidence a probate court estate inventory regarding the Estate of Inza Weedman, the decedent's widow, for the purpose of proving Weedman's damages. On cross-appeal, Weedman contends that the trial judge erred by granting summary judgment in favor of Financial Benefit Life Insurance Company and by granting a pretrial motion for dismissal filed by Metropolitan Life Insurance Company.

We hold that the trial court erred by excluding testimony from Easterling, Delores Waymire, and Hazel Cruthirds concerning the decedent's intent not to give anything to Weedman, and that it erred by receiving the probate inventory into evidence. As to the cross-appeal, we hold that the trial court committed no error in granting the dismissal motion filed by cross-appellee Metropolitan Life Insurance Company. However, we hold that the trial court erred when it granted summary judgment in favor of Financial Benefit Life Insurance Company. Therefore, we reverse and remand for new trial as to Easterling's direct appeal, reverse and remand for new trial as to Weedman's cross-appeal regarding Financial Benefit Life Insurance Company, and affirm as to Weedman's cross-appeal regarding Metropolitan Life Insurance Company.

## FACTUAL HISTORY

In October 1987, Mark Weedman, Sr., purchased a $300,000 annuity from Metropolitan Life Insurance Company. In December 1988, the decedent purchased a $200,000 flexible premium annuity from Financial Benefit Life Insurance Company. Douglas Easterling sold both contracts to the decedent in his capacity as a licensed insurance agent appointed by Metropolitan Life Insurance Company and Financial Benefit Life Insurance Company. In January 1989, the decedent exercised the right to receive payments under the Metropolitan annuity. Mark Weedman, Sr., died February 17, 1990, survived by his widow, Inza Weedman, and his son, Mark Weedman, Jr., Inza Weedman, the decedent's fifth wife and Mark Weedman's step-mother, died on March 21, 1990, slightly more than a month later, and was survived by her sister, Hazel Cruthirds, and her brother, William (Bill) Selby.

Mark Weedman, Sr., died intestate, and Inza Weedman inherited the bulk of his estate. After Mark Weedman, Sr., died, his son discovered that the proceeds from the Metropolitan Life and Financial Benefit annuities were paid to Inza Weedman. This lawsuit arose from the dispute over the proceeds from those annuities and the confusion that exists because of the alleged negligence by Easterling in completing the annuity applications. Mark Weedman, Jr., is identified on each application as the annuitant (the person by whose life the term of the contract is measured). The application for the Financial Benefit flexible premium annuity contains the name of Mark Weedman or Inza Weedman as the beneficiary, and does not indicate which Mark Weedman was intended (Mark

Weedman, Sr., or Mark Weedman, Jr.). That application listed Mark D. Weedman as the annuitant and contains a signature purporting to be that of Mark Weedman as annuitant. Easterling signed appellee Weedman's name as annuitant without Weedman's knowledge or consent. Although he listed appellee Weedman as the annuitant, Easterling inserted the decedent Weedman's social security number on the Financial Benefit annuity application in the space that provided for the annuitant's social security number.

Easterling also prepared a request for an optional income plan for the Metropolitan annuity in January 1989. That request listed "Mark Weedman" as payee, and listed Mark or Inza Weedman, father and stepmother of the payee, as contingent payees. It also showed the payee's date of birth to be 1-11-27 (that of appellee Weedman), but showed the payee's address as 715 North University in Little Rock, an address where appellee Weedman had not lived since 1950. The request that Easterling prepared contains the purported signature of Mark Weedman as payee, and his correct birth date. However, appellee Weedman denied signing the request, consenting to his signature being placed on the application, or knowing that the request had been made. He also never received monthly payments from the Metropolitan annuity.

Appellee Weedman, acting in his personal capacity and as personal representative of the estate of decedent Weedman, sued Easterling, Metropolitan Life, and Financial Benefit in an declaratory judgment action, and alleged that because of the negligence, fraud, and misrepresentation of Easterling in his capacity as agent for Metropolitan Life and Financial Benefit, all benefits payable under the annuities had been wrongfully paid to other parties, including the administrator of Inza Weedman's estate. Appellee Weedman contended that the benefits payable under the annuities were intended by decedent Weedman to go to appellee Weedman after the deaths of Mark Weedman, Sr., and Inza Weedman, and he requested that the court determine the rights to those benefits. Alternately, appellee Weedman contended that the annuities should be reformed to carry out the intent of the owner (decedent Weedman) that appellee Weedman receive the benefits upon the death of Mark Weedman, Sr., and Inza Weedman. Easterling denied the allegations of fraud, misrepresentation, and negligence. Financial Benefit and Metropolitan Life denied liability to appellee Weedman on theories of vicarious liability. As trial approached, Financial

Benefit filed a motion for summary judgment, and Metropolitan Life filed a motion to dismiss. The trial court granted both motions. For sake of clarity, we shall first address the issues in the appeal, followed by those presented by the cross-appeal.

## EASTERLING'S APPEAL

*Hearsay Testimony.*

Easterling argues that the trial court erred by excluding his testimony concerning whether the decedent Weedman intended for appellee Weedman to receive the proceeds from the annuities. Before the trial began, the trial judge ruled that Easterling would not be allowed to testify about statements made by the decedent to the effect that he was purchasing the annuities to protect his wife (Inza Weedman), and that he did not want his son (appellee Weedman) to receive anything. As the trial judge observed, the decedent's intent was the crux of the lawsuit. A proffer was made of Easterling's excluded testimony based upon the hearsay objection by appellee Weedman. Easterling's proffered and excluded testimony, given during questioning by his counsel, was as follows:

> Q. Mr. Easterling, when you met with Mark, Sr., and Inza in connection with the application for the Metropolitan annuity, did you attempt to discover from Mark, Sr., and Inza Weedman their intent with regard to the ownership and beneficiary interest of that annuity?
>
> A. Yes.
>
> Q. Did they expressly tell you what their intent was?
>
> A. Their express intent was this was for the sole purpose of them and them only.
>
> Q. And what (sic) was that intent expressed to you?
>
> A. The intent was expressed that they were the sole owners and beneficiaries and future users of this annuity.
>
> Q. Did they express any intent with regard to Mark, Jr., having an ownership interest?
>
> A. Yes.
>
> Q. What was that intent?

A. The intent was that he was not to even know that it existed, much less have any interest, future interest.

Q. So I would assume your testimony would also be that they expressed it was their intent that Mark, Jr., wouldn't serve as a beneficiary or payee of the Metropolitan annuity?

A. True, yes.

. . .

Q. Did you have similar discussions with Mr. Weedman at the time the supplemental income policy under the Metropolitan annuity was taken out?

A. Yes.

Q. I'm talking about when that Metropolitan annuity was converted to a monthly pay. Okay. What intent did Mark, Sr., express to you?

A. First of all, that he wanted a monthly income stream and that it was his purpose and Inza's purpose. He may have asked the question, in fact, he did, what happens if something happened to me, and I said, it would continue the income stream for Inza.

Q. Now, in connection with the Financial Benefit annuity, did you have similar discussions with Mark about the ownership interest and the beneficiary interest under that annuity?

A. Yes.

Q. Can you tell me what Mark, Sr.'s, expressed intent was in regard with that annuity in connection with the ownership and the beneficiary's interest?

A. For simplistic sake, he wanted it done just like the other one. He didn't want anyone else to know. It was for the ownership and use of himself and Inza.

Q. Did Mark, Sr., ever indicate to you his intentions with regard to Mark, Jr. In connection with the Financial Benefit policy, or Financial Benefit annuity, rather?

A. I'm sorry. Will you ask that question—I'm sorry, I didn't - I'm sorry, will you ask the question - I'm sorry.

Q. Uh-huh. Did Mark, Sr., in connection with the Financial Benefit annuity, give you any indication that he ever wanted Mark, Jr., to have any rights as owner or beneficiary under that policy?

A. No.

Q. By no, are you telling me he told you that he did not want Mark, Jr., to have any benefits of ownership or any benefits as a beneficiary?

A. Yes.

Easterling also made a proffer concerning the substance of the testimony that would have been given by Hazel Cruthirds, Inza Weedman's sister. The proffer regarding the testimony from Cruthirds was as follows:

MR. STRAUSS (counsel for Easterling): Your Honor, we anticipate that, if allowed to — if she had been allowed to testify, Mrs. Cruthirds' testimony would have been that, in her presence, Mark Weedman, Sr., had made numerous disparaging remarks about Mark Weedman, Jr., including remarks much like, I don't want him to get any of my money, I don't want him to have anything of mine. There were numerous remarks of this nature, Your Honor, and we contend that they reflect an intent or a state of mind and, therefore, constitutes an exception to the hearsay rule.

Easterling also proffered testimony from Delores Waymire, a bank officer who had sold the decedent certificates of deposit and had discussed with him what would happen to those funds in the event that he predeceased his wife. The proffered testimony from Waymire was as follows:

Q. When you first met with Mr. Mark and were discussing with him the different investment options that he had, I believe that you testified that you disclosed to him that there were five options, three of which you've already testified to. What were the other two investment options regarding CD's that you discussed with Mark, Sr., and Ms. Inza?

A. Mr. Mark had indicated that the funds were to be solely his or Ms. Inza's. To eliminate any other part of the estate from obtaining any funds, the CD issued in one person's name; a for instance, Mr. Mark, Sr., the — any other family members, if that went into — if it was issued in his name only, then the other family members could come in on that estate and obtain those funds. Mr. Mark had on numerous occasions indicated that he did not want Mark, Jr., to have, I quote, "a damn thing of his." So, with the insurance of account, it had to be in — he had to have a will to eliminate this possibility, and that's where the will came into existence.

Q. Now, let me summarize or try to summarize what you've told us about the five accounts, and if I go wrong, let me know. You've testified that there are three accounts that a depositor can take out without the necessity of writing a will, and one would be a joint account, one would be an account in the name of the husband payable on death to the wife, the third one would be an account in the name of the wife payable on death to the husband?

A. Right.

Q. I think your testimony is that a depositor can have two more accounts insured up to $100,000 each if there is a will. And the way those accounts would be handled would be in the name of the individual husband and the other account would be in the name of the individual wife. Is —

A. That is correct.

Q. So after that discussion — There were five CD's issued. Is that right?

A. That is right.

Q. And I — Is it your testimony that the fourth and the fifth CD's were named — were titled individually in Mr. Mark's name and individually in Ms. Inza's name?

A. That is correct.

Q. Was the will executed at the time those fourth and fifth CD's were issued?

A. Yes, sir.

Q. So when Mr. Mark and Ms. Inza came in with their handwritten wills, they also came in with money to open up two additional accounts. Is that right?

A. Yes, sir.

Q. Do you recall the amounts of those accounts?

A. Ninety-five thousand.

Q. Ninety-five thousand dollars each?

A. Each, each. Yes, sir.

Q. At the time that Mr. Mark and Ms. Inza came in asking you to be a witness on their will, did they tell you what the contents of that will were?

A. Mr. Mark had indicated that he wanted everything that he had to go to Ms. Inza, this he had mentioned previously, and everything that was Ms. Inza's was to go to him, eliminating Mark, Jr.

Q. Was there a specific reference in this conversation to Mark Weedman, Jr.?

A. Yes, sir.

Q. By whom?

A. Mr. Mark indicating he wanted to invest more money with us, but was there any way that he could do so and eliminate him. So, and —

Q. Now, when you say eliminate "him" ..

A. Mark, Jr. And I told him, I asked him at that point, did he have a will, and he said no. And I told him that the only way would be for him to have a will and he said, write me one, and I said, I can't do it. And I said, I can give you a copy of my will and you can use that as — to go by to write your own will, but you must mention Mark, Jr.'s, name in the will.

Q. You explained that to him?

A. Yes, sir.

Q. That he needed to mention Mark, Jr., in the will?

A. In the will.

Q. Now, that was a meeting prior to the date that you actually witnessed the wills, right?

A. It — right.

Q. Were there any discussions about Mark, Jr., at the time the wills were executed?

A. No, sir.

. . .

Q. How did you become aware that he had a child?

A. I mentioned — He was asking about insurance of accounts again.

Q. Okay, that — Okay.

A. And I mentioned that he could have one covered under he (sic) with a child and he immediately became very enraged, he said, I don't want — I have a son, but I don't want him to get a damn thing of mine. He said he's lazy and he's no good and we never hear from him and we don't want him to have any money.

Appellee Weedman objected to the foregoing testimony on hearsay grounds. He also objected to Easterling's proffered testimony concerning the decedent's intent to leave nothing to his son on the ground that it was inadmissible pursuant to Rule 403 of the Arkansas Rules of Evidence because its probative value was outweighed by its prejudicial effect.

■■ Hearsay is defined as a statement, other than one made by the declarant while testifying at the trial or hearing, that is offered in evidence to prove the truth of the matter asserted. Ark. R. Evid. 801(c). Hearsay is not admissible except as provided by law or by the rules of evidence. Ark. R. Evid. 802. Appellee Weedman argued successfully at trial and contends in response to Easterling's appeal that the testimony from Easterling, Cruthirds, and Waymire was hearsay that is not excepted from the general rule of inadmissibility. Easterling argues, on the other hand, that statements made by the decedent concerning his intent insofar as appellee Weedman's beneficiary status on the annuities amount to admissions of a party opponent because appellee Weedman sued as personal representative of the decedent's estate as well as in his individual capacity. To

that extent, Easterling maintains that the admissibility of the testimony concerning the decedent's intent is governed by Rule 801(d)(2) of the Rules of Evidence, which states:

> Statements Which Are Not Hearsay. A statement is not hearsay if: . . . (2) Admission by party-opponent. The statement is offered against a party and is (i) his own statement, in either his individual or a representative capacity, (ii) a statement of which he has manifested his adoption or belief in its truth, (iii) a statement by a person authorized by him to make a statement concerning the subject, (iv) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, or (v) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

We hold that the testimony by Easterling concerning the decedent's statements to him that he did not want his son to be beneficiary or payee as to the annuities was not hearsay and, therefore, was improperly excluded. The decedent was the owner of the annuities in question. He made the purported statements to Easterling concerning his intentions that his son not benefit from the annuities, and that the annuities benefit his wife. The decedent's statement was against the interest of his estate because the estate would not benefit from the annuities upon the decedent's death based upon his decision to name his wife as the beneficiary. As personal representative of the decedent's estate and as the decedent's heir at law, appellee Weedman was a party against whose interest the decedent's statements were directed.

To this extent, this case is similar to that of *Inmon v. Southwest Auto Supply, Inc.*, 268 Ark. 1140, 599 S.W.2d 420 (Ark. App. 1980). That case involved a lawsuit against a man who wrote a check on a partnership account to settle a personal debt, and told the creditor's manager to apply the partnership check to his past due personal account. The trial court allowed the creditor's manager to testify concerning the man's directions to apply the partnership check to his personal account. Our court upheld that ruling on appeal in an opinion written by Judge Marian Penix that concluded that the testimony from the creditor's manager was not hearsay concerning the declarations by the debtor because he was an agent of the partnership, made the statement directing the application for the payment from partnership funds while the partnership existed, and

the statement was against the interest of the partnership. For similar reasons, we find that the testimony from Easterling concerning the decedent's statements that appellee Weedman was not to benefit from the annuities involved in this litigation was not hearsay, and was, therefore, admissible pursuant to Rule 801(d)(2) of the Rules of Evidence.

Although the proffered testimony from Hazel Cruthirds and Delores Waymire concerning the decedent's statements to them concerning his desire that his son receive none of his property did not address the annuities, that testimony should not have been excluded. Rule 803(3) of our Rules of Evidence states:

> Rule 803. Hearsay exceptions — Availability of declarant immaterial. — The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . . (3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, . . .

The core of this litigation is whether the decedent intended to make appellee Weedman the beneficiary or payee for the annuities. The testimony from Cruthirds and Waymire regarding the decedent's statements that appellee Weedman receive none of his assets is both admissible to show his then existing intent not to give appellee Weedman anything, as well as his motive for deciding as he did. In *Greenwood v. Wilson*, 267 Ark. 68, 588 S.W.2d 701 (1979), a dispute arose concerning the validity of an instrument that the testator signed leaving all his property to his second wife if she survived him. The instrument was in the handwriting of the second wife, and its validity was challenged by the testator's first wife on behalf of a minor adopted child of the first marriage. After the probate court upheld the will against challenges of lack of testamentary capacity and undue influence, the challenger contended on appeal, in part, that testimony by the second wife regarding the testator's statements made as to his intent was inadmissible. The Supreme Court refused to even consider that assertion because Rule 803(3) permits such statements concerning present intent. We believe that the Rule applies to the proffered testimony from Cruthirds and Waymire in this case.

*The Rule 403 Objection.*

■ The trial court also sustained Weedman's objection to Easterling's testimony about the decedent's statements concerning the identity of the beneficiary for the annuities based upon Rule 403 of the Rules of Evidence. That rule provides that relevant evidence may be excluded if its probative value is substantially outweighed by its prejudicial effect. Relevant evidence may be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence. *Gruzen* v. *State*, 267 Ark. 380, 591 S.W.2d 342 (1979), *cert. denied*, 449 U.S. 852 (1980), 459 U.S. 1020 (1982). The trial court has discretion in determining the relevance of evidence and in gauging its probative value against unfair prejudice, and its decision on such a matter will not be reversed absent abuse of that discretion. *Robinson* v. *State*, 314 Ark. 243, 861 S.W.2d 548 (1993). The prejudice referred to in Rule 403 denotes the effect of the evidence upon the jury, not the party opposed to it. *Sasser* v. *State*, 321 Ark. 438, 902 S.W.2d 773 (1995).

■■ After reviewing the record of Easterling's proffered testimony, we conclude that it was an abuse of discretion for the trial court to exclude his testimony concerning the decedent's statements about the intended beneficiary of the annuities. Easterling was accused of having negligently prepared the applications for the annuities so that the decedent's alleged intent to benefit his son, appellee Weedman, was frustrated, resulting in monetary damage to the son. In order to render a verdict, the jury had to first decide whether the decedent intended to benefit his son insofar as the proceeds from the annuities were concerned. This necessarily meant that evidence relevant to the decedent's intent, and especially his intent toward benefiting his son as opposed to his wife, was quite relevant for the jury to consider. As we observed in another context, the probative value of evidence correlates inversely to the availability of other means of proving the issue for which the allegedly prejudicial evidence is offered. *Smith* v. *State*, 19 Ark. App. 188, 718 S.W.2d 475 (1986). Under Rule 403, the probative value and alleged unfair prejudice of the evidence in question must somehow be assessed, and these values must be compared to determine which will advance the search for truth. Based on that comparison, the proffered evidence may be admitted or rejected.

The only other evidence of the decedent's beneficiary intent concerning the annuities aside from Easterling's testimony was the annuity applications. Easterling completed the applications and discussed their contents with the decedent. Whether he misrepresented the decedent's intent by his mistakes was for the jury to decide. But the jury had the right to know what the decedent had told Easterling he wanted done with the annuity proceeds upon his death: Easterling's testimony would have been unfavorable to appellee Weedman; however, that did not render it prejudicial to the jury, confusing, misleading, or burdensome to the trial process.

*The Inza Weedman Estate Inventory.*

■ Easterling also argues that the trial court erred when it admitted a probate inventory from the estate of Inza Weedman into evidence over his hearsay objection. Inza Weedman died within a month of her husband's death, and her estate received the benefits from the annuities involved in this litigation. Appellee Weedman offered a certified copy of the probate inventory into evidence in an effort to show the extent of his damages, and relies upon Rule 902(4) of the Rules of Evidence in support of the trial court's decision in favor of its admissibility. That rule, however, deals with the authenticity of documents, not admissibility.[1] As Easterling correctly contends, Rule 902 does not except any document from the rules concerning hearsay. Authentic documents that constitute out of court statements offered for the truth of the matters asserted in them are merely hearsay and, pursuant to Rule 802, are inadmissible unless covered by an exception to the rules concerning hearsay evidence or by other law.

■ Appellee Weedman contends that the probate inventory was properly admitted pursuant to Rule 803(8), which provides that public records and reports that set forth the regularly conducted and

---

[1] Rule 902(4) reads:

Self-authentication. — Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

(4) Certified copies of public records. A copy of an official record or report or entry therein, or of a document authorized by law to be recorded or filed and actually recorded or filed in a public office, including data compilations in any form, certified as correct by the custodian or other person authorized to make the certification, by certificate complying with paragraph (1), (2), or (3) [of Rule 902], or complying with any law of the United States or of this State.

recorded activities of a public office or agency are not excluded by the hearsay rule.[2] However, the public records and reports exception to the general rule excluding hearsay evidence applies to public records and reports of governmental offices and agencies as to their activities. The exception exists because the law deems the reports from governmental offices concerning their regularly conducted and recorded activities to be trustworthy statements of what was done in the public interest. Private parties may not bootstrap what amounts to hearsay about private conduct merely by getting a private report of that conduct filed at a courthouse. The probate inventory was filed in a public office, to be sure, but it was not a record of or statement about anything that a public official or agency had done. It was, at most, a statement by Patrick J. Morrison, the administrator of Inza Weedman's estate, concerning the property that Inza Weedman owned when she died. The inventory was offered to prove, as true, that Inza Weedman's intangible personal property included the Financial Benefit Life Annuity with a net value of $225,692.04, and the Metropolitan Life Annuity having a value of $332,718.42.

Even if a representative from the office of the probate clerk had been present to testify, any testimony about the specifics of the inventory (and especially these annuities) would have been hearsay. The probate clerk had not observed or done anything regarding the annuities. The most that the clerk had done was to receive the administrator's inventory and file-stamp it. That effort did not cause the inventory to be evidence of the probate clerk's knowledge concerning the material issue of whether Inza Weedman's estate owned the proceeds from the annuities. Thus, the public records and reports exception was not met, and the inventory was improperly admitted.

---

[2] Rule 803(8) reads, in pertinent part:
Hearsay exceptions — Availability of declarant immaterial. — The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
(8) Public records and reports. To the extent not otherwise provided in this paragraph, records, reports, statements, or data compilations in any form of a public office or agency setting forth its regularly conducted and regularly recorded activities, or matters observed pursuant to duty imposed by law and as to which there was a duty to report, or factual findings resulting from an investigation made pursuant to authority granted by law.

## WEEDMAN'S CROSS APPEAL

*Financial Benefit's Summary Judgment.*

Weedman contends that the trial court erred by granting Financial Benefit's motion for summary judgment. Financial Benefit filed the motion, supported by the affidavit of Jennifer Asewicz, its Assistant Vice-President, and contended that because Easterling was an independent contractor there was no basis for holding Financial Benefit vicariously liable for his negligence. In her affidavit, Asewicz asserted that Easterling was paid on commission, that no taxes or Social Security deductions were made from his earnings, that he was not provided workers' compensation or errors and omissions coverage, and that he signed a contract that described his relationship with Financial Benefit as that of independent contractor rather than employee. Weedman contends that genuine issues of material fact were created by the conflicting provisions of the Managing General Agent Agreement that Easterling executed.

 Of course, the object of summary judgment proceedings is not to try the issues, but to determine if there are issues to be tried, and if there is any doubt whatsoever, the motion for summary judgment should be denied. *Walker* v. *Stephens*, 3 Ark. App. 205, 626 S.W.2d 200 (1981). On appellate review we must review the evidence in the light most favorable to the party against whom summary judgment was granted. *Young* v. *Paxton*, 316 Ark. 655, 873 S.W.2d 546 (1994). The burden of proving that there is no genuine issue of material fact is upon the movant, and all proof submitted must be viewed in a light most favorable to the party resisting the motion. Any doubts and inferences must be resolved against the moving party. *Pinkston* v. *Lovell*, 296 Ark. 543, 759 S.W.2d 20 (1988).

 The question of duty owed by one person to another is ordinarily one of law. However, when the matter of a legal duty is the subject of a contract which is ambiguous as to the parties' intent, a question of fact is presented. *Elkins* v. *Arkla, Inc.*, 312 Ark. 280, 849 S.W.2d 489 (1993). That case involved review of an appeal from the entry of summary judgment in favor of a defendant in a wrongful death case brought by the administratrix of the estate of a construction worker whose employer had contracted with Arkla, Inc., to lay a pipe. The worker died when a 10-foot-deep ditch in which he was working collapsed and suffocated him.

Arkla moved for summary judgment and argued that the construction company for whom the plaintiff's decedent worked was an independent contractor responsible for supervising the job, thereby relieving Arkla of a duty to the decedent to assure that the work was performed safely. The trial court granted summary judgment. The Supreme Court reversed and remanded in an opinion written by Justice Newbern that contains the following pertinent statement:

> Even though the owner of a construction project hires an independent contractor to do the work, the owner may retain the right and duty to supervise to the extent that it becomes responsible for injury resulting from negligence in performance of the work.

The Restatement (Second) of Torts § 414 (1965), provides:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

As Comment C to that section states,

> In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. *There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.*

312 Ark. at 282 (emphasis in opinion). The Supreme Court determined in *Elkins* that although some of the contractual provisions appeared to support Arkla's argument that it had limited supervisory authority, other provisions appeared to give Arkla general authority to supervise the details of the work. Justice Newbern also observed that the Supreme Court has found in other cases that a contract

with an independent contractor presented a question of fact with respect to the duty to supervise. *See Erhart* v. *Hummonds*, 232 Ark. 133, 334 S.W.2d 869 (1960); *see also Walker* v. *Wittenberg, et al.*, 241 Ark. 525, 412 S.W.2d 62 (1966).

We believe that the holding in *Elkins* and the cases cited therein apply to this case. Granted, Article 2 of the Managing General Agent Agreement that Easterling signed with Financial Benefit provides that nothing in that agreement shall be construed to create the relationship of employer-employee or principal and agent between Financial Benefit and Easterling (referred to in the agreement as "the Agency"), and that Easterling's relationship to Financial Benefit shall only be as an independent contractor. However, Article 3 of the agreement provides that Easterling (as the Agency) "shall be subject to rules and regulations as from time to time may be issued by Financial." The fact asserted by Asewicz in her affidavit (that Financial Benefit never directed or supervised the means and manner of Easterling's performance or his conduct) may support the argument that the agreement did not require such supervision or direction, but the apparent inconsistency between the provisions rendered them ambiguous on the question and made summary judgment inappropriate.

Even if the jury agreed with Financial Benefit that Easterling was an independent contractor, a genuine issue of material fact remained whether Financial Benefit had been negligent in supervising him, particularly where it had retained the right to issue rules and regulations concerning his conduct in procuring applications for the annuity policy that the decedent purchased through Easterling. The jury might have concluded that retention of the right to issue rules and regulations included the right to issue such rules and regulations necessary to prevent the kind of mistakes that appellee Weedman accused Easterling of making. It might have concluded that the retained right to issue rules and regulations did not go that far at all. However, that is the kind of inference drawing and proof weighing that belongs to the trier of fact and which makes summary judgment inappropriate.

*The Metropolitan Motion to Dismiss.*

The final issue on Weedman's cross-appeal involves the trial court's decision granting the motion to dismiss by Metropolitan Life Insurance Company. Pursuant to Rule 12(b)(6) of the

Arkansas Rules of Civil Procedure, Metropolitan moved to dismiss certain counts of Weedman's First Amended Complaint that alleged statutory liability of insurance companies for acts, omissions, or representations of agents. Alternatively, Metropolitan Life moved that Weedman be ordered to provide a more definite statement pursuant to Rule 12(e), including a citation to the statute relied upon. Weedman did not file a response to the motion to dismiss, and cited no statute that imposes liability on an insurer for the acts of its agent. The trial court ruled that no such statute existed, and granted the dismissal motion. We will not address the merits of that ruling because Weedman has neither cited us to authority nor put forth an argument concerning it in his cross-appeal. It is well settled that appellate courts will not consider a point raised on appeal where the appealing party does not cite authority for it, makes no convincing argument on it, and it is readily apparent that the argument has no validity. *Mikel* v. *Hubbard*, 317 Ark. 125, 876 S.W.2d 558 (1994). Therefore, we affirm, as to Weedman's cross-appeal, the trial court's ruling that granted the motion to dismiss filed by Metropolitan Life.

## SUMMARY

We hold that the trial court erred by excluding the testimony from Easterling, Hazel Cruthirds, and Delores Waymire concerning the decedent's intent, and that it erred by admitting into evidence the probate inventory of Inza Weedman's estate over Easterling's hearsay objection. Therefore, we reverse and remand as to Easterling's appeal. We further hold that the trial court erred in granting summary judgment in favor of Financial Benefit because a genuine issue of material fact existed regarding Financial Benefit's duty to supervise Easterling, even if the jury deemed him to be an independent contractor. Hence, we reverse and remand on Weedman's cross-appeal as to Financial Benefit. However, we affirm the trial court's decision to grant the motion to dismiss by Metropolitan Life because Weedman has failed to cite any authority and offer argument on that point.

PITTMAN and MAYFIELD, JJ., agree.