Christopher Scott EDWARDS, a minor, by and through his father and next friend, Robert Lloyd EDWARDS; Randy MOORE and Cindy MOORE, by and through their mother and next friend, Diane MOORE *v.* Janie VAUGHT

84-239                                                681 S.W.2d 322

Supreme Court of Arkansas
Opinion delivered December 17, 1984
[Rehearing denied January 21, 1985.*]

*PURTLE, J., would grant rehearing.

Wright & Chaney, P.A., by: Donald P. Chaney, for appellant.

Rose Law Firm, A Professional Association, by: Phillip Carroll, for appellee.

P.A. HOLLINGSWORTH, Justice. The issues presented by this appeal all involve a will contest. The appellants are the step-great-grandchildren of the decedent, Austin Napoleon Davis. On August 31, 1981, at the age of 90, the decedent wrote his first will which named the appellants as beneficiaries. Ten days later, on September 10, 1981, the decedent wrote a second will which named the appellee, his next door neighbor, as the sole beneficiary. The decedent died on October 10, 1982, and the second will was admitted to

probate. The appellants filed a petition to contest the probate of the second will and also filed a companion case in Chancery Court to remove the appellee's name from two certificates of deposit that were owned by the decedent. The cases were consolidated for trial and the trial judge found that the second will was valid and that the certificates of deposit were not void. It is from that decision that this appeal is brought. This appeal is before us under Sup. Ct. R. 29 (1) (p).

The appellants raise numerous issues on this appeal, all of which basically involve the decedent's alleged lack of testamentary capacity and the exercise of undue influence by the appellee in procuring the testator's will.

Davis, the testator, married Florence Edwards in 1960. He had two children by a previous marriage with whom he had no contact for the last thirty years of his life and for whom he made no provision in either will. Mrs. Davis had two children by a prior marriage also. The appellents are her great-grandchildren through her son.

Considerable testimony was given about the close family relationship between the Edwards family and Davis. All the families lived in the vicinity of each other and spent many holidays and vacations together. The great-grandchildren were brought to spend time with Davis and his wife frequently. Mrs. Davis died in August 1981.

The appellee and her husband were next door neighbors of Florence and Austin Davis for about ten years. Testimony showed that they spent many evenings with the elderly couple, visiting and playing games. Shortly before Mrs. Davis died, the appellee began looking in on the decedent and mowing his lawn for him. In June 1981, a social worker made an official arrangement with the appellee whereby she would provide meals and general care for the decedent in exchange for $35 a week. This arrangement continued until Davis' death.

The circumstances surrounding the making of the first will were as follows: Robert Lloyd Edwards, the father of the

appellant, Christopher Scott Edwards, testified that the decedent asked him to recommend a lawyer. At Davis' request, Edwards took him to see Jimmy Featherston, a lawyer in Murfreesboro. On the way there, Edwards testified that Davis told him he intended to leave his estate to Christopher and to Edwards' sister's children because "he said that he wanted to favor" his step grand-children without directly giving them anything as he said they did not need it. Edwards, accompanied by his father, Robert C. Edwards, helped Davis into the lawyer's office and the three sat around Featherston's desk while Davis made out a will. Edwards testified that he acted as an interpreter for Davis, who was hard of hearing, by repeating Featherston's comments to Davis. After the will was prepared, Davis signed it and paid Featherston. The will, written August 31, 1981, stated: "I give my entire estate to Christopher Scott Edwards, Randy Moore, and Cindy Moore, per stirpes." Edwards testified that Davis kept a copy of the will and he kept the original. The only time Edwards said that Davis mentioned the will after that was at the next Christmas when Davis said, "Won't the children be surprised when they learn what I've done for them." The Edwards family discovered the existence of the second will shortly before the testator died.

The second will was drawn up ten days after the first will. Kenneth Vaught, the appellee's husband, testified that toward the end of the first week of September 1981, Davis spoke to him about making a new will. He testified that Mr. Davis said, "I don't have much but I have a little. But, I want to leave it to somebody that helps me." Vaught testified that he told the testator he and his wife did not want anything in return for caring for him, but Davis insisted and asked Vaught how he "wanted it to go." Vaught stated that he told him to put it in his wife's name since she would be caring for the testator more than he would. Vaught also stated that he told the testator to wait until the next day and make sure that that was still what he wanted and, if it was, Mrs. Vaught would take him to a lawyer. The only reason Davis gave, according to Vaught, for his actions was that the Edwards family did not care anything about him and he did not want them to have his money.

The day after the testator's statements to Vaught, Mrs. Vaught took Davis to Featherston, the same lawyer, to write a second will. She did not stay in the room when the will was written but rather left the testator alone with Featherston.

The second will reads as follows:

I, Austin Napoleon Davis, . . . being mindful of my children and descendants and being of sound and disposing mind and memory do hereby make and publish this my last will and testament revoking all prior wills made by me and especially revoking that will I made a few days ago. . . . 2. I give my entire estate to my neighbor who has looked after me and fed me ever since I have lived at Murfreesboro, Mrs. Janie Vaught . . . "

For this appeal, the appellants claim generally that the trial court's decision was against a preponderance of the evidence and was clearly erroneous. Specifically they argue that undue influence was presumptively established by the evidence since a confidential relationship existed between the decedent and the appellee; the appellee procured the making of the second will; the decedent suffered from mental and physical infirmities; and the second will made an unnatural disposition excluding the natural objects of the decedent's bounty. The appellants also claim that the appellee failed to rebut the presumption of undue influence after the burden of proof shifted to her and that the decedent suffered from an insane delusion when the second will was procured.

We review probate and chancery cases on appeal de novo and affirm the probate judge or chancellor unless the order is clearly erroneous. *Rose* v. *Dunn*, 284 Ark. 42, 679 S.W.2d 180 (1984). The burden of proving undue influence or lack of mental capacity is on the party challenging the validity of the will, the appellants here. *Rose, supra.* We said in *Rose* that when a will is procured by the primary beneficiary, "a rebuttable presumption of undue influence arises which places on the beneficiary the burden of proving beyond a reasonable doubt that the testator enjoyed both

required mental capacity and freedom of will."

Here, there was no direct evidence that the appellee procured the will. She did not participate in the writing of the will and merely transported the decedent to the lawyer's office. The trial judge therefore correctly placed on the appellants the burden of proving the testator's mental incompetency and any undue influence exercised by the appellee.

We defined undue influence in *Greenwood, Guardian* v. *Wilson,* 267 Ark. 68, 588 S.W.2d 701 (1979), as:

> [N]ot the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion, or any other cause deprives the testator of his free agency in the disposition of his property. And the influence must be specifically directed toward the object of procuring a will in favor of particular parties. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relation with them at the time of its execution.

*See Short* v. *Stephenson,* 238 Ark. 1048, 386 S.W.2d 501 (1965); *Sullivant* v. *Sullivant,* 236 Ark. 95, 364 S.W.2d 665 (1963).

Furthermore, we pointed out in *Rogers* v. *Crisp, Ex'x,* 241 Ark. 68, 406 S.W.2d 329 (1966), that:

> [I]t is well settled that influence, consisting of appeals, requests, entreaties, arguments, flattery, cajolery, per- suasion, solicitations, or even importunity is legiti- mate and becomes "undue," so as to invalidate the will, only when it is extended to such a degree as to override the discretion and destroy the free agency of the testator.

There is no evidence of that here. The chancellor was in a superior position to judge the witnesses' credibility. We cannot say that his finding that the appellants failed to

prove undue influence by a preponderance of the evidence is clearly erroneous.

As to the decedent's testamentary capacity, the fact that the wills were executed in such a short time span is an important factor. In *Union Nat'l Bank* v. *Leigh,* 256 Ark. 531, 509 S.W.2d 539 (1974), two wills and a codicil were executed one year apart. We stated, "[i]f there had been any such abrupt cessation of testamentary capacity, we should expect it to be reflected in the testamony of the two doctors . . . There is, however, no such testimony."

Similarly, here the decedent's physician testified that his mental condition varied in that sometimes he was a little confused and sometimes he was "pretty clear."

In *Rogers, supra,* we stated that:

It is not unusual for some member of a family to feel that he has been mistreated by other members of the family, and, whether right or wrong, it is apparent that Lewis had "fallen out" with his sister. Nor can it be said to be abnormal or unnatural for a testator, without wife and children, to leave property to a good friend rather that to a collateral relative.

In *Sullivant* v. *Sullivant, supra,* we stated:

Capacity to understand the effect of making one's will, and not actual understanding is the test of mental capacity required of the testator . . . Testators are not required by law to mete out equal and exact justice to all expectant relations in the disposition of their estates by will, and the motives of partiality, affection, or resentment, by which they naturally may be influenced, are not subject to examination and review by the courts.

Here, the fact that Davis had the capacity to understand the effect of his second will is demonstrated by the language, "revoking all prior wills and especially that one I made a few days ago." And as stated above, the fact that the appellants

expected part of the estate and the testator disappointed them is not subject to judicial examination and review. The chancellor found that the testator had the requisite capacity and that finding is not clearly erroneous.

This same principle was stated in *Abel* v. *Dickinson,* 250 Ark. 648, 467 S.W.2d 154 (1971), where we said:

> The expression "unjust and unnatural will" is usually applied when a testator leaves his estate, or a large portion of it, to strangers, to the exclusion of natural objects of his bounty without any apparent reason. A will cannot be said to be unnatural because a testator preferred one for whom she had developed a close and affectionate relationship . . . or when the natural objects of the testator's bounty are in no need of funds, aid or assistance.

As to the insane delusions that appellants claim the decedent experienced, we stated in *Huffman* v. *Dawkins,* 273 Ark. 520, 622 S.W.2d 159 (1981), that an insane delusion is:

> Where one conceives something extravagant, and believes it as a fact, when in reality it has no existence, but is purely a product of the imagination, and where such belief is so persistent and permanent that the one who entertains it cannot be convinced by any evidence or argument to the contrary, such a person is possessed by an insane delusion . . .
>
> Such a delusion must not only exist but the will must be a product of the delusion . . . If there is *any* basis in fact for the delusion, or if it is not proved that the will was a product of the delusion, such a delusion will not warrant setting aside a legal document.

We also stated in *Huffman* that there was conflicting evidence about the presence of an insane delusion, it was the role of the probate court to resolve the conflict. The appellants contend that the testator's statement that the Edwardses did not care about him was an insane delusion; the probate court was in the better position to resolve such a contention.

The appellant's remaining points on appeal are that the appellee should not be allowed to profit by her wrongful acts in causing the death of the decedent and that the certificates of deposit were void because of the fraud and undue influence exercised by the appellee. The first argument is without merit. We also uphold the chancellor's finding that there was no fraud or undue influence by the appellee as regards the certificates of deposit and that they are therefore valid.

Affirmed.

HUBBELL, C.J.,, not participating.