Michael PYLE *v.* Brian SAYERS

CA 99-1502                                      34 S.W.3d 786

Court of Appeals of Arkansas
Divisions I, II, and III
Opinion delivered December 20, 2000

*Shackleford, Phillips, Wineland & Ratcliff, P.A.*, for appellant.

*John D. Lightfoot, P.L.L.C.*, for appellee.

JOHN E. JENNINGS, Judge. This case is a will contest, with issues concerning undue influence and mental capacity. Mabel Hammond was seventy-five years old in the summer of 1998. On May 12, 1998, she was admitted to the hospital in El Dorado. She was seen by Dr. Barry Moore, who diagnosed her as suffering from (1) depression, (2) dementia, possibly Alzheimer's disease, and (3) weight loss, possibly due to cancer. Dr. Moore determined by history that Mrs. Hammond had suffered several strokes in the past.

On May 18, Mrs. Hammond was admitted to Oak Ridge Nursing Home in El Dorado. On June 8 she executed the will in question at the nursing home. The will left her entire estate to her husband, W.A. Hammond. If her husband predeceased her, her jewelry was left to her great-niece Karen Sayers, and a great-grand-niece, Sarah Sayers, with the residue of her estate to go to a great-nephew, Brian Sayers, and his wife, Rhonda Sayers, in equal shares. Approximately two weeks later W.A. Hammond died of cancer at home.

Mrs. Hammond left Oak Ridge Nursing Home on June 15. She died at home on June 25. Brian Sayers, the appellee here, filed a petition in Union County Probate Court to probate Mrs. Hammond's will. The petition was opposed by the appellant, Michael Pyle, on his own behalf as Mrs. Hammond's nephew and heir at law, and as guardian for his mother, Mary Pyle, the testatrix's sister.[1]

Following a hearing, the probate judge issued an extensive letter opinion finding the will to be valid. On appeal, Mr. Pyle argues (1) the trial court erred in not requiring the will's proponents to overcome the rebuttable presumption of undue influence and lack of mental capacity and (2) the trial court's decision on these issues was clearly erroneous. We affirm.

Appellant's first argument is:

---

[1] Mary Pyle did not testify at trial and there was evidence that it may have been as long as twenty years since she and Mabel Hammond had seen each other.

> The court charged the appellee with the duty of presenting proof of lack of undue influence and presence of testamentary capacity beyond a reasonable doubt. However, the true duty of the proponent is to overcome a presumption that the testatrix did not have testamentary capacity and was not [*sic*] unduly influenced by their proponent of the will by presenting proof beyond a reasonable doubt.

■ This is a distinction without a difference. The trial court held, the appellee concedes, and we agree, that the will was procured by the beneficiary within the meaning of the law. When a beneficiary procures a will, there is a rebuttable presumption of undue influence and a lack of capacity. *See Looney v. Estate of Wade*, 310 Ark. 708, 839 S.W.2d 531 (1992).

■■ As the appellant correctly states, questions of testamentary capacity and undue influence are so interwoven in any case where these questions are raised that the court necessarily considers them together. *See Rose v. Dunn*, 284 Ark. 42, 679 S.W.2d 180 (1984); *Greenwood v. Wilson*, 267 Ark. 68, 588 S.W.2d 701 (1979); *Short v. Stephenson*, 238 Ark. 1048, 386 Ark. 501 (1965).

In *Hiler v. Cude*, 248 Ark. 1065, 455 S.W.2d 891 (1970), the supreme court said:

> We adhere to the rule that the burden of proving mental incompetency, undue influence and fraud which will defeat a will is upon the party contesting it. We hold this burden, in the sense of the ultimate risk of nonpersuasion, never shifts from the contestant. This does not, however, conflict with the rule concerning the burden of going forward with the evidence or burden of evidence.

■ In *Rose v. Dunn*, 284 Ark. 42, 679 Ark. 180 (1984), the court said that "the presumption of undue influence in the case of a beneficiary who procures the making of a will does not shift the ultimate burden of proof." In *Hodges v. Cannon*, 68 Ark. App. 170, 5 S.W.3d 89 (1999), we explained:

> In the case of a beneficiary of a will who procures the making of the will, a rebuttable presumption of undue influence arises, which places on the beneficiary the burden of going forward with evidence that would permit a rational fact-finder to conclude, beyond a reasonable doubt, that the will is not the product of insufficient mental capacity or undue influence. *Looney v. Estate of Wade*, 310 Ark. 708, 839 S.W.2d 531 (1992); *Edwards v. Vaught*, 284 Ark. 262,

681 S.W.2d 322 (1984); and *Rose v. Dunn*, 284 Ark. 42, 679 S.W.2d 180 (1984).

■ In both his letter opinion and final order, the probate judge stated that the will's proponents bore the burden of proof on both issues beyond a reasonable doubt. The trial court did not err in this regard.

Appellant's final argument is that the evidence does not support the trial court's finding that Mrs. Hammond had the mental capacity to execute the will and that she was not subjected to undue influences. We hold that the probate judge's decision was not clearly erroneous.

### The Standard of Review

■ We will reverse a probate court's determination on the questions of mental capacity and undue influence only if they are clearly erroneous, giving due deference to the superior position of the trial judge to determine the credibility of the witnesses and the weight to be accorded their testimony. *See Reddoch v. Blair*, 285 Ark. 446, 688 S.W.2d 286 (1985). While our review must take into consideration that the will's proponent bore the burden of proof, or the burden of going forward with the evidence, beyond a reasonable doubt, the question on appeal is not whether we have such a doubt. The situation is analogous to an appeal in a criminal case: the burden of proof is beyond a reasonable doubt, but our standard of review is whether the jury verdict is supported by substantial evidence.

### Substantive Law on Mental Capacity

■ Every person of sound mind and disposing memory has the untrammeled right to dispose of his or her property by will as he or she pleases. *See Puryear v. Puryear*, 192 Ark. 692, 94 S.W.2d 695 (1936). If the maker of a will has sufficient mental capacity to retain in his memory, without prompting, the extent and condition of his property, and to comprehend how he is disposing of it, and to whom, and upon what consideration, then he possesses sufficient mental capacity to execute such an instrument. *Richard v. Smith*, 235 Ark. 752, 361 Ark. 741 (1962). Sufficient mental ability to exercise

a reasonable judgment concerning these matters in protecting *his own interest in dealing with another* is all the law requires. *Id.* With respect to the ability to know the extent and condition of the property to be disposed and to whom it is being given, and to appreciate the desserts and relations to the testator of others against whom he discriminates or excludes from participation in his estate, it is unnecessary that he actually has this knowledge. *See Huffaker v. Beers,* 95 Ark. 158, 128 S.W. 1040 (1910). It is sufficient if he has the mental capacity to understand the effect of his will as executed. *Puryear, supra.* If a person has such mental capacity then, in the absence of fraud, duress, or undue influence, mental weakness, whether produced by old age or through physical infirmities, will not invalidate an instrument executed by him. *Richard, supra; McCulloch v. Campbell,* 49 Ark. 367, 5 S.W. 590 (1887). A testator's old age, physical incapacity, and partial eclipse of mind will not invalidate a will if he has the requisite testamentary capacity when the will is executed. *Hodges v. Cannon,* 68 Ark. App. 170, 5 S.W.3d 89 (1999). A testatrix does not lack testamentary capacity merely because old age has impaired her mental faculties. *See Noland v. Noland,* 330 Ark. 660, 956 S.W.2d 173 (1997).

## Undue Influence

The influence that the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion, or any other cause that deprives the testator of his free agency in the disposition of her property. *Orr v. Love,* 225 Ark. 505, 283 S.W.2d 667 (1955). With respect to a will obtained by influence, it is not unlawful for a person, by honest intercession and persuasion, to procure a will in favor of himself, or another person. *McDaniel v. Crosby,* 19 Ark. 533 (1858). Whether the disposition was a natural one is a relevant inquiry. *See Boggianna v. Anderson,* 78 Ark. 420, 94 S.W. 51 (1906). The influence of children over parents is legitimate so long as they do not extend a positive dictation and control over the mind of the testator. *Greenwood v. Wilson,* 267 Ark. 68, 588 S.W.2d 701 (1979). Cases involving undue influence will frequently depend on the credibility of witnesses. *Higgs v. Estate of Higgs,* 48 Ark. App. 148, 892 S.W.2d 284 (1995).

*The Facts*

Karen Richards testified that she was Brian Sayers' sister and Mabel Hammond's great-niece. She testified that she and Brian moved in with Mrs. Hammond when she was twelve and Brian was eight or nine. She visited her in the nursing home two weeks before her death and testified that Mrs. Hammond recognized her. She also recognized Karen Richards's son, Jace, although she had not seen him in five years.

Mrs. Richards testified that Mrs. Hammond was physically withered and had not been eating right. She testified that Mrs. Hammond's mental capacity was about the same as it had been five years previously although she was very tired and did not speak as much. She testified that her great-aunt was closer to Brian than any of them because he had come to her house at a younger age than the rest. Mrs. Richards was a psychiatric registered nurse and testified that she thought Mrs. Hammond was of sound mind.

Edwin Gogo was a registered nurse at Oak Ridge Nursing Home. He testified that she was oriented to herself and some family members. He said that Mrs. Hammond always told him that Brian Sayers was her son. He testified that Mrs. Hammond was only disoriented at nighttime and described that as the "sundown syndrome."

Donna Rainey was the social services director at Oak Ridge Nursing Home. She testified that Mrs. Hammond was very frail and weak. She said that Mrs. Hammond's husband had been taking care of her at home and that they were both sick. She testified that Mrs. Hammond realized they were both terminally ill and said that she did not think she could stay at home and watch him die.

Mrs. Rainey testified that Mrs. Hammond knew what she wanted and that she was "very clear in those regards." She testified that Brian was there everyday. She said, "I think Mrs. Hammond knew her own mind as far as what she wanted." She testified that Mrs. Hammond called Brian Sayers her son.

Diane Beeson was a LPN at Oak Ridge Nursing Home. She testified that Mrs. Hammond was alert and knew herself and family. She said that Mrs. Hammond knew she was in the hospital and nursing home, but she did not know where.

Angela Oles was a supervising registered nurse at Oak Ridge Nursing Home. She testified that Mrs. Hammond was a terminal-stage, medicare patient who had a poor appetite. She testified that at the time Mrs. Hammond signed a living will proxy, she knew what she was doing. She also testified that Mrs. Hammond always referred to Brian Sayers as her son.

Charles L. Massey was a licensed practical nurse at Oak Ridge Nursing Home. He testified that Mrs. Hammond was a thin, frail little lady. He testified that when Brian Sayers would come into her room she would smile.

Jennifer Hughes was employed at Dr. Rick Brown's office and was asked by Lily Gregory, a co-worker, to witness Mrs. Hammond's will. She testified that she did not get the impression that anything was being forced upon Mrs. Hammond. She testified that Brian Sayers read the will aloud to her and that she asked certain questions about how the will was drafted. Mrs. Hughes testified that she was satisfied of Mrs. Hammond's competence when she signed and witnessed the will and that in her opinion Mrs. Hammond understood what she was signing.

Lily Ann Gregory testified that she also worked for Dr. Brown in El Dorado and that she had known Mr. and Mrs. Hammond over a period of approximately twenty years. She testified that she had heard Mrs. Hammond refer to Brian as her child and she would not be surprised that if, in the nursing home, Mrs. Hammond referred to him that way. She testified that Mrs. Hammond recognized her when she came into the room although she had not seen her for a couple of years. She testified that she had no question as to Mrs. Hammond's competence at the moment she initialed and signed the will.

Mary Breshears testified that she had known Mabel Hammond since 1982 and that she had referred to Brian Sayers as her son. She testified that she never detected anything that concerned her about the soundness of her mind during her stay in the nursing home.

Brian Sayers testified that Mabel Hammond was his great-aunt and that he had come to live with her in the fourth grade and had lived with her ever since. He believed he had been adopted by her. He testified that she said some things that caused him to ask her if she wanted a will, and she said that she did. He testified that there

was no doubt in his mind that the will was understood by her and expressed her wishes. He testified:

> I am not going to say that auntie wasn't very frail, and not all of the time was she quite as sharp as she always was. But never at one time can I remember did auntie not know what was going on, what was being talked to her, or what we were discussing.

He testified that she had no other heirs who had made contact with her in the last ten or twenty years that he could remember.

Dr. Barry Moore testified that Brian Sayers was taking care of Mrs. Hammond daily. He expressed his opinion "to a reasonable degree of medical certainty" as to whether Mrs. Hammond would have had sufficient mental capacity on the day of the execution of the will to understand without prompting the natural "recipients" of her bounty. He said that she lacked such capacity. He testified that it was his understanding that a person must be "oriented to time, place and person."

What the nursing home personnel meant when they said Mrs. Hammond was "confused as to time and place" is clearly explained in Mr. Gogo's testimony. He said, "If I were in front of Mrs. Hammond now and asked her the time and she said twelve noon and the time was actually 11:15 a.m. I would have entered that as confused as to exact time. If a family member had asked her if she knew where she was, and she said she is in the nursing home, I can say she is disoriented as to the exact place."

The dissent finds the single reference to Mrs. Hammond's "children" in the will to be quite significant. It seems reasonable to assume, however, that Mrs. Hammond believed the will referred to her stepchildren. The dissent also places great weight on the use of the word "trustee" in the will but neglects to say that the word only appears in the phrase "executor and trustee." The probate judge did not find this language to be of any great importance, nor do we.

■ The testimony offered by the proponent and the other witnesses of the will is sufficient, if believed, to establish that Mrs. Hammond was competent to execute the will and that the will was not the product of undue influence. The trial court was entitled to credit the testimony of these witnesses. The court's decision is not clearly erroneous.

Affirmed.

PITTMAN, HART, BIRD, and KOONCE, JJ., agree.

GRIFFEN, STROUD, NEAL, and CRABTREE, JJ., dissent.

WENDELL L. GRIFFEN, Judge, dissenting. Today the majority affirms a decision that the chief beneficiary of a will who procured it rebutted the longstanding legal presumption of undue influence by proving beyond a reasonable .doubt that the testator possessed the requisite testamentary capacity when she signed the will and that she was not acting under undue influence in the face of a probate court decision that disregarded undue influence altogether. Although the testator was childless, the majority affirms a decision that there is no reasonable doubt about her testamentary capacity after she signed a will calling for her husband to make "adequate provision for my children after my death." The will refers six times to "my . . . Trustee;" however, the proponent presented no proof that a trust ever existed or that the testator ever contemplated creating a trust. The record shows that the testator was survived by a sister; yet, the same testimony from the proponent that the majority relies upon to affirm shows that the testator thought her stepchildren would inherit her estate if she died without a will and that she never acted as if she knew who were her natural heirs. I firmly believe that the chancellor erred when he found that appellee, the proponent of the will, proved beyond a reasonable doubt that the testator had the mental capacity to execute a will and that she was not acting under undue influence. I respectfully dissent.

*Background Facts and Burden of Proof*

In the spring of 1998, seventy-five-year-old Mabel Hammond and her husband, W. A. Hammond, were in failing health. W. A. Hammond was dying of cancer. He had been caring for his wife and managing their household affairs for several years because Mabel Hammond had not been able to care for herself. She suffered from senile dementia, possible Alzheimer's disease, severe weight loss, depression, a bad cough (later diagnosed as related to her previously undiagnosed condition of lung cancer which had metastasized to her liver and was terminal), and disorientation. On May 12, 1998, W.A. Hammond arranged for Mabel Hammond to be

admitted to Union Medical Center in El Dorado, Arkansas, where she was treated by Dr. Barry L. Moore from May 12 to May 18, 1998. After she was discharged from the hospital, Mabel Hammond was admitted to Oak Ridge Nursing Home where she resided until discharged to her home on June 15, 1998.

On June 8, 1998, Mabel Hammond signed a will that left the majority of her estate to her great-nephew, appellee Brian Sayers, if her husband did not survive her. Her husband died the following day (June 9, 1998). Mabel Hammond died on June 25, 1998, (two weeks later). She never had children, but was survived by a sister, Mary Pyle. Michael Pyle, appellant, is the guardian of the personal estate of Mary Pyle, his mother. After appellee presented the purported will to the Union County Probate Court on July 1, 1998, appellant objected to the will on three grounds: (1) that the will was procured by appellee; (2) or that the will was the result of undue influence; and (3) that Mabel Hammond lacked the testamentary capacity to execute a will.

The probate court conducted a trial on May 5 and 6, 1999, concerning the will contest. On June 1, 1999, the probate judge entered an order admitting the will to probate. The second paragraph of that order reads:

> This is a will contest, specifically whether the testatrix Mabel Hammond had the requisite mental capacity and was not acting under undue influence on June 8, 1998 when she executed a will. *The issue here is mental capacity as the facts do not indicate any undue influence.* (Emphasis added.)

The same opinion also contained the following statement:

> The evidence is not controverted that Brian Sayers procured the will and benefits from its provisions. The law in Arkansas is clear that when a will is valid on its face an opponent of the will must prove by a preponderance of the evidence that the testator either lacked the mental capacity to execute a will or did so under undue influence. However, if the proponent of the will procured the will and benefits from the will then the burden of proving the will is on the proponent. The burden of proof is under those circumstances beyond a reasonable doubt.

It has long been the law in Arkansas that a party challenging the validity of a will must typically prove *by a preponderance of the*

*evidence* that the testator lacked the requisite mental capacity or that the testator was the victim of undue influence when the will was executed. *See Greenwood v. Wilson,* 267 Ark. 68, 588 S.W.2d 701 (1979); *Sullivant v. Sullivant,* 236 Ark. 95, 364 S.W.2d 665 (1963); *Orr v. Love,* 225 Ark. 505, 283 S.W.2d 667 (1955). *See also Oliver v. Griffe,* 8 Ark. App. 152, 649 S.W.2d 192, (1983). However, it is equally settled that when the person benefitting from the will also engages in drafting or procuring the will, a rebuttable presumption of undue influence arises and creates a burden for the proponent of the will to prove *beyond a reasonable doubt that the testator had both the testamentary capacity as well as the freedom from undue influence to execute a valid will. See Smith v. Welch, et al.,* 268 Ark. 510, 597 S.W.2d 593 (1980); *Short v. Stephenson,* 238 Ark. 1048, 386 S.W.2d 501 (1965); *Orr v. Love, supra,* ; *McDaniel v. Crosby,* 19 Ark. 533 (1858). *See also Oliver v. Griffe, supra.* Our supreme court has often stated that the questions of testamentary capacity and undue influence are so interwoven in any case where these questions are raised that the court necessarily considers them together, for in one case where the mind of the testator is strong and alert the facts constituting undue influence would be required to be felt stronger than in another case where the mind of the testator was impaired either by some inherent defect or by the consequences of disease or advancing age. *Short v. Stephenson, supra.*

It is true that "every person of sound mind and disposing memory has the untrammeled right to dispose of [her] property by will as [she] pleases." *See Puryear v. Puryear,* 192 Ark. 692, 694 S.W.2d 695, 696 (1936). This means that if the maker of a will has sufficient mental capacity to retain in her memory, without prompting, the extent and condition of her property and to comprehend how she is disposing of it, to whom, and upon what consideration, then she possesses sufficient mental capacity to execute the will. *Richard v. Smith,* 235 Ark. 752, 361 S.W.2d 741 (1962). And our supreme court has frequently observed that the relevant inquiry is not the mental capacity of the testator before or after a challenged will is signed, but rather the level of capacity at the time the will was signed. *See Noland v. Noland,* 330 Ark. 660, 956 S.W. 2d 173 (1997); *Daley v. Boroughs,* 310 Ark. 274, 835 S.W.2d 858 (1992); *Hiler v. Cude,* 248 Ark. 1065, 455 S.W.2d 891 (1970).

As for undue influence, our supreme court stated in *Orr v. Love, supra,* as follows:

> The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion or any other cause that deprives the testator of his free agency in the disposition of his property.

225 Ark at 510, 283 S.W.2d at 670. *See also In re Estate of Davidson,* 310 Ark. 639, 839 S.W.2d 214 (1992).

Although the majority cites the supreme court's decision in *Noland, supra,* along with other decisions holding that one who procures a will has the burden of proving *beyond a reasonable doubt* that the testator executed the will while possessed of requisite mental capacity and without undue influence, it ignores clear wording in both the *Noland* majority and dissenting opinions that the *burden of proof* shifts to the procurer to overcome the rebuttable presumption of undue influence that arises whenever one benefits from the procurement. *Noland* involved a challenge to a chancellor's decision that the appellants procured a testamentary trust and related warranty deed from Wesley E. Noland, deceased, and failed to prove beyond a reasonable doubt that Noland possessed the requisite mental capacity and acted without undue influence when he created the Wesley E. Noland Irrevocable Trust and conveyed his one-third interest in a family farm to it. Justice Brown, writing for the majority in *Noland,* stated:

> Because we reverse this case on the basis of Wesley Noland's mental capacity and free agency, we need not address the issue of whether the burden of proof was improperly shifted to the appellants. We assume for purposes of this analysis, as the trial court found, that at least one of the appellants, Jerry Noland, procured the Wesley E. Noland Trust and that the appellants all benefitted from this procurement. *With this assumption, a presumption that the trust was the result of undue influence arises under our caselaw and the burden of proof then shifts to the proponents of the trust to prove beyond a reasonable doubt that Wesley Noland had both the mental capacity and freedom of will to render the trust legally valid.*

330 Ark. at 664, 956 S.W.2d at 175 (citations omitted) (emphasis added). After analyzing the proof on the issue of mental capacity, Justice Brown's opinion in *Noland* introduced the undue influence analysis with the following statement: "We next turn to the issue of

whether the appellants met their *burden of proof* concerning Wesley Noland's free agency. . . ." (Emphasis added.)

Justice Imber, writing for the three dissenting justices in *Noland*, introduced her opinion as follows:

> While the majority does not decide whether the trial court correctly shifted the burden to the trust's proponent, it nonetheless concludes that if the burden of proof did shift, the trial court was clearly erroneous in finding that the proponent failed to meet his burden to prove Wesley Noland's mental capacity beyond a reasonable doubt. . . .
>
> Assuming for purposes of capacity analysis, as does the majority, that Jerry Noland procured and benefitted from the 1991 trust instrument, *the burden shifted to him to prove beyond a reasonable doubt that Wesley Noland possessed the requisite testamentary capacity. This shifting burden marks a significant departure from what is required from a proponent in a "typical" will-contest case.* . . .

330 Ark. at 673, 956 S.W.2d at 180, (Imber, J., dissenting) (emphasis added).

*Noland* was not the first time our supreme court declared that the burden of proof shifts to the proponent of a procured will to rebut the presumption of undue influence by proof beyond a reasonable doubt that the testator possessed the requisite mental capacity to make a will and was free from undue influence. In *Greenwood v. Wilson*, 267 Ark. 68, 588 S.W.2d 701 (1979), the court held that a proponent of a will who is a beneficiary and who drafted the will or caused it to be drafted must prove beyond a reasonable doubt that it was not the result of undue influence and that the testator had the mental capacity to make it. Similarly, in *Smith v. Welch*, 268 Ark. 510, 597 S.W.2d 593 (1980), the court again held that when a beneficiary procures the making of a will, he bears the burden of showing beyond a reasonable doubt that the testator had both mental capacity and such freedom of will and actions as are required to render the will legally valid. *See also Looney v. Estate of Wade*, 310 Ark. 708, 839 S.W.2d 531 (1992). Given the consistent and plain meaning of these supreme court decisions, the majority is mistaken in concluding that the burden of proof did not shift to the appellee regarding the testator's mental capacity and freedom from undue influence.

The probate court correctly observed that the uncontroverted proof is that Brian Sayers procured Mabel Hammond's will and benefitted from its provisions. Specifically, the will bequeathed Hammond's estate to her husband if he survived her, and provided that if W.A. Hammond predeceased her, then all the estate was bequeathed to Brian Sayers and his wife, Rhonda Sayers, except for jewelry specifically bequeathed to Sarah Sayers (the daughter of Brian Sayers), and Karen Sayers (his older sister).

The probate court recognized that appellee, as proponent of the will under which he was a clear beneficiary, had the burden of proving that Mabel Hammond had the mental capacity to execute the will and that she was not acting under undue influence. The idea that the burden of proof does not shift in the case of a procured bequest makes no logical sense when one considers the quantum of proof required to overcome the rebuttable presumption that arises in will contests. *How could a challenger of a procured will ever prove by a preponderance of the evidence that the will resulted from undue influence when the proponent and procurer of the will has established by proof beyond a reasonable doubt that no undue influence was exercised and that the testator signed the will while possessed of the requisite mental capacity?*

### Undue Influence

But the probate court erred when it analyzed the will contest as only involving mental capacity because "the facts do not indicate any undue influence." Undue influence was presumed under long-standing Arkansas caselaw. It is undisputed that Brian Sayers procured the will and benefitted from it. He selected a lawyer (John D. Lightfoot of El Dorado) to prepare the will. Sayers met with Lightfoot privately and dictated the provisions of the will that disinherited Hammond's sister, called for contingent bequests to Hammond's nonexistent children, referred to a Trustee of a nonexistent trust, and provided for Sayers, his wife, daughter, and sister to be the beneficiaries of Hammond's estate in the event that Hammond's husband predeceased her.

Lightfoot never interviewed Mabel Hammond, never prepared a draft for her review, never discussed the drafted will with her to determine whether she understood it or had questions about it, and never had any other contact with her about the will Sayers directed

him to prepare. Instead, Lightfoot prepared the will and delivered it to Sayers. Sayers obtained the witnesses to the will, presented the will to Hammond, and directed the will execution process. He also directed Lightfoot to prepare a power of attorney and living will.

The record simply does not contain proof beyond a reasonable doubt that Hammond freely and independently disinherited her sister. In fact, Brian Sayers admitted on cross examination that Hammond incorrectly believed that her stepchildren would inherit her estate if her husband predeceased her and she then died intestate. Sayers took no effort to correct Hammond's misapprehension; instead, he specifically directed Lightfoot to prepare a will calling for Hammond's estate to pass to him and his family members rather than to her sister (appellant's mother) if Hammond's husband predeceased her.

The majority opinion attempts to evade this glaring defect by reviewing the testimony offered by Sayers and his witnesses in reaching the following conclusion: "The testimony offered by the proponent and the other witnesses of the will is sufficient, if believed, to establish that Mrs. Hammond was competent to execute the will and that the will was not the product of undue influence." However, none of that testimony explained why a childless woman decided to sign a will that provided for her estate to pass to her children if her husband predeceased her. Sayers admitted during his testimony that although he lived with Hammond and her husband from his early childhood, Hammond knew she had not adopted him. Sayers admitted that it was his understanding and Hammond's understanding that "if Uncle Willie were to die and she didn't have a will, and this is what we discussed together, is that Bill and Margaret Ann (Hammond's stepchildren) would receive the bounty of the estate."

The fact that Mabel Hammond signed a will that referred to "my children" when she knew — or should have known — that she was childless and had not adopted appellee cannot be reasoned away by suggesting that Hammond "believed the will referred to her stepchildren." Appellee testified that Hammond's purpose for making the will was to *prevent* her stepchildren from inheriting her estate.

The will contains six references to a trustee. No trust was created by the will. The will makes no reference to a trust otherwise. There is no proof in the record that Mabel Hammond had a trust and no proof explaining why Mabel Hammond signed the will despite such language.

Sayers plainly did not satisfy the heavy burden of overcoming the rebuttable presumption of undue influence by proof beyond a reasonable doubt, the most stringent evidentiary standard in American jurisprudence. Hence, the probate court erred when it summarily dismissed the undue influence issue by stating, "*The issue here is mental capacity as the facts do not indicate any undue influence.*"

### Mental Capacity

Sayers testified that Hammond feared that if she did not have a will, her stepchildren would inherit her estate if her husband predeceased her.[1] In fact, Hammond was survived by a sister, appellant's mother, who would have inherited her estate had she died intestate. Certainly a reasonable doubt exists about Hammond's mental capacity based on testimony that shows Hammond did not even realize her sister was a natural object of her bounty. Hammond's failure to even question the reference to nonexistent children, combined with appellee's testimony that she never indicated knowing that her sister was her natural heir and that she was consciously excluding her from her estate, create serious doubt that decedent recognized the natural claimants to her estate. No evidence contradicts Dr. Moore's testimony that Hammond had been unable to

---

[1] Appellee testified as follows: "Well, it was my understanding—I mean I can't presume, but I mean, my understanding that if, and her understanding that if Uncle Willie [the testator's husband] were to die, and she didn't have, you know a will, and this is what we discussed together, is that Bill and Margaret Ann [the testator's stepchildren] would receive the bounty of her estate."

Q: So she did not know that actually if she didn't have a will that her estate would go to Mary Ann Griffith Pyle, Michael Pyle's mother?

A: She never mentioned them, not one time.

Q: So there was never a discussion about who her natural heirs would be?

A: Uh-huh.

Q: Is that a yes?

A: Yes.

manage her affairs for three years before her death and that the household and financial affairs were handled by her husband due to Hammond's severe dementia. Brian Sayers admitted that Hammond did not know her assets.

When this proof is considered alongside Dr. Barry Moore's testimony and that from other witnesses, it is even more difficult to defend the conclusion that Sayers proved beyond a reasonable doubt that Hammond possessed the requisite mental capacity when she signed the will. Dr. Moore opined that Hammond suffered from severe dementia. Dr. Moore testified that although Hammond was alert each time he spoke with her during her hospitalization and on the one occasion he observed her at the nursing home after her hospital discharge, she did not realize where she was during the hospitalization and was not oriented as to time and date. He never observed Hammond when she demonstrated "an island of clarity" in her mental faculties. Dr. Moore testified that Hammond's husband had informed him that Hammond had been unable to take care of her affairs and household affairs for approximately three years before she was hospitalized in May 1998.

Despite Dr. Moore's testimony that he knew of no instance when a person with such longstanding dementia as Hammond suffered suddenly improved to the point she could handle her affairs, and despite the fact that the record contains no contrary evidence from a physician, the probate court and majority refer to testimony by nursing home workers who attended Hammond in support of the result reached below and affirmed today. While I agree that we ordinarily defer to probate judges concerning witness credibility and the weight to be accorded testimony, that deference does not detract from our responsibility to conduct a *de novo* review of the record to determine if the probate court decision is clearly erroneous. *See Noland, supra.*

In this regard, the record shows that the nursing home personnel who testified about Hammond's mental condition consistently documented that she was confused as to time and place. Hammond always told the nursing home staff that Brian Sayers was her son, not her great-nephew. None of the witnesses offered any testimony showing that Hammond had sufficient mental capacity to retain in her memory, without prompting, the extent and condition of her property and to comprehend how she wanted to dispose of it, to

whom, and upon what consideration. *See Richard v. Smith, supra.* Given these realities, the probate court's decision that appellee met his burden of proving beyond a reasonable doubt that Hammond had the requisite testamentary capacity is clearly erroneous.

## Legal Ethics

Sadly, this case demonstrates how cavalier a lawyer can be when dealing with legal affairs affecting the elderly. Rule 1.1 of the Model Rules of Professional Conduct provides that a lawyer shall provide competent representation to a client and that competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation. Rule 1.2 (a) provides that a lawyer shall abide by a client's decision concerning the objectives of representation and shall consult with the client as to the means by which they are to be pursued. Rule 1.4(b) states that a lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation. The attorney who drafted this will owed these duties to Mabel Hammond, not Brian Sayers. Yet, by his own admission, counsel never met Hammond, spoke with her about the will, or otherwise dealt with her concerning what is now affirmed as her last will and testament. Even if I shared the view of this case held by the majority, I cannot condone or otherwise excuse the way counsel handled this serious transaction.

I respectfully dissent, and am authorized to state that Judges STROUD, NEAL, and CRABTREE join in this opinion.