

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV–15–263

FARRIS E. HOLLIMAN, SHEILA D. HOLLIMAN and LEON HOLLIMAN, in his individual capacity and as Trustee of the ZOE HOLLIMAN REVOCABLE TRUST

APPELLANTS

V.

LINDA S. JOHNSON, in her individual capacity and as Successor Trustee of the ZOE HOLLIMAN REVOCABLE TRUST, and GARRY W. HOLLIMAN, in his individual capacity and as Trustee of the ZOE HOLLIMAN REVOCABLE TRUST

APPELLEES

**OPINION DELIVERED** JANUARY 27, 2016

APPEAL FROM THE CLEBURNE COUNTY CIRCUIT COURT
[NO. CV-2010-238-4]

HONORABLE TIM WEAVER, JUDGE

AFFIRMED

## ROBERT J. GLADWIN, Chief Judge

Farris Holliman, Sheila Holliman, and Leon Holliman, individually and in his capacity as trustee of the Zoe Holliman Revocable Trust (Trust), appeal the Cleburne County Circuit Court's December 2, 2014 order denying and dismissing their claims of undue influence and breach of fiduciary duty, among others, against appellees Linda Johnson and Garry Holliman, both in their individual capacities and as trustee and successor trustee of the Trust. Appellants contend that the trial court erred in finding that the settlor decedent, ninety-four-year-old Zoe Nellie Holliman, was not unduly influenced and had the requisite capacity to execute the Trust.

I. *Facts*

Zoe and her husband John Hersel Holliman had six children—Farris, Leon, Corlis, Altis, Garry, and Linda. John Hersel Holliman died in 1999; thereafter, the six children shared, with varying responsibilities, in the care of their mother, Zoe. Leon testified that he helped with her finances, including paying her bills from his own funds each month and reimbursing himself by collecting her endorsed social security checks. According to his testimony, Leon cared for Zoe's lawn and home maintenance, and she exclusively relied on him after his father's death.

On December 11, 2008, Zoe signed a Last Will and Testament (Will) devising her property in equal shares to her six children. The Will was signed after a family discussion that included Zoe and her six children, and her property was not specifically listed in the Will. At the time that she signed the Will, Zoe owned 300 acres, which she divided and deeded to her children by separate deeds on May 9, 2009. Zoe did not deed any mineral rights associated with the property, but maintained title to those rights. Also on May 9, 2009, each of the children signed an agreement as Zoe's heirs, acknowledging their duties to Zoe and allocating their respective duties and the management of her property.

On October 25, 2009, Zoe fell and broke her leg. She was admitted to the hospital, underwent surgery, and spent time in rehabilitation. After about fifteen days, Zoe was released from the hospital and went to her home, where she was cared for by her children on a rotating basis. Linda began staying most nights with her mother, and she and Garry advocated Zoe taking her Oxycodone prescription medication, but the other four siblings were against it because they believed the medication was too strong. Leon testified that

Zoe had a hospital bed at her house, but that Linda "took her out and started sleeping with her," although she had not done so in the prior ten years.

Zoe was readmitted to the hospital in mid-December 2009, and she stayed there three weeks. The family celebrated Christmas 2009 in the hospital with Zoe. On December 30, 2009, Zoe, who was still hospitalized, signed the Trust, equally dividing her property at her death among her six children. Zoe, Garry, and Leon were named as joint trustees, and Linda was named as successor trustee. Linda and Garry were at the hospital-room meeting with Zoe and the attorneys who prepared the Trust and associated documents, but Zoe's other children were not present. Leon testified that Garry asked him to go to the hospital on December 30, 2009, because Zoe "had a surprise" for him and his brothers. Leon said that instead of going on December 30, he and others had visited Zoe the day before, and she did not tell them about the Trust. However, Leon later signed as joint trustee of the Trust.

The Trust specifically listed 159 acres as part of Zoe's property. This specific listing differentiates the Trust from Zoe's previous Will. Farris claimed that he had purchased the 159 acres in 1978 but did not want it titled in his name. He said that his siblings knew that the 159 acres were his, and that he paid his father and Leon for it, mostly with cash, but had no receipts. Farris said that his mother had given him the "bonus" money she received on the 159 acres based on the mineral rights, and he believed that he owned the 159 acres. Evidence was presented that the parties disagreed on the ownership of the 159 acres, some believing that Farris had purchased it through his father with Leon's help, and others

believing that Farris had never paid his father or Leon for the property.  All acknowledged, however, that the acreage was titled in Zoe's name.

Upon Zoe's release from the hospital in January 2010, she returned to her home, but her children began to disagree among themselves regarding her care.  Distrust developed among the siblings, and Linda eventually moved Zoe into her own home.  Leon testified as follows:

> I think Linda and Garry set up this trust so they would have full control of Momma's assets.  Because they already had control of her mind.  Because they had been brainwashing her for all this time.  And she didn't know no better.  Momma received her first royalty check the first day she was in the hospital in—that would have been '09, I think.  October, probably of '09.  That check was $26,000.  The next month she received an oil and gas check and I believe it was close to the same; about $26,000.  In the ten years I did her finances, she never received an amount of money that large.  Her social security was $412 a month, I believe.  The rent income was $400 a month.  Her CDs received interest monthly.  She'd get about $30 or $31 apiece off of them every month.  At the time the Will and the family agreement and the deeds were passed out, Momma was receiving a minimal amount of money each month.  In the two months prior to the Trust being executed Momma received two $26,000 oil and gas checks.  That is what I'm referring to about them wanting to be in control.  That and all her assets.  I mean, that would give them control of everything.

Zoe was hospitalized in February 2010, and Leon and Farris alleged that they were barred from seeing her.  On April 9, 2010, guardianship proceedings were initiated.

On May 13, 2010, Leon was appointed guardian of Zoe's person and estate in an ex parte temporary guardianship order.  At that time, Zoe was readmitted to the hospital.  Subsequently, Linda filed a motion to vacate the ex parte order, attaching an affidavit sworn to by her son, Brent Johnson, who alleged that his grandmother Zoe had requested that her sons only visit her "one at a time," but that they never complied with her wishes; that Zoe was in the hospital on a feeding tube on May 12, 2010, when her sons visited; that Zoe's

medical-care providers recommended that she be taken home and placed in hospice care; that Zoe was given a week to ten days to survive; that Zoe was taken to his mother's house on May 13, 2010; and that his uncles arrived that night with the ex parte order and police, removed his grandmother from his mother's home, and took her to Conway Regional Hospital. He further alleged that his uncles' issues with his grandmother and his mother began when his grandmother created a trust that divided her assets equally "between all six of her children and not just the four uncles." Zoe remained in the hospital until she died on May 30, 2010.

On July 21, 2010, Farris, Corlis, Altis, and Leon, individually and as trustee of the Trust, and Leon's wife Sheila Holliman filed a complaint against Garry, individually and in his capacity as trustee of the Trust, Brent Johnson, Linda, individually and as successor trustee of the Trust, and Linda's husband James E. Johnson praying that the Trust be set aside because it was procured through undue influence and because Zoe lacked the requisite capacity to make it. This complaint was dismissed on November 9, 2010, but was refiled on December 6, 2010, in its current form. An appeal was made to this court after the trial court granted the defendants' motion to dismiss. *See Holliman v. Johnson*, 2012 Ark. App. 354, 417 S.W.3d 222 (where this court reversed and remanded the trial court's granting of defendants' motion to dismiss, holding that a responsive pleading praying for dismissal "pursuant to Rule 12(b) of the Arkansas Rules of Civil Procedure" did not preserve their Rule 12(b)(4) (insufficiency of process) and Rule 12(b)(5) (insufficiency of service of process) defenses). Upon remand, Corlis and Altis nonsuited their claims by order filed

January 17, 2013, leaving Farris, Leon, individually and as joint trustee, and his wife Sheila as plaintiffs/appellants.

On November 3, 2014, a bench trial was held. The trial court heard testimony from appellants, opposing experts regarding Zoe's capacity to execute the Trust, the attorney who prepared and witnessed Zoe's execution of the Trust and accompanying documents, and Garry. The trial court also reviewed the videotaped execution of the Trust and the accompanying documents, which was recorded in Zoe's hospital room on December 30, 2009. The trial court found no evidence of undue influence and found that Zoe had the requisite capacity to execute the trust instrument. Accordingly, appellants' request for a return of all funds held in a nontrust account that were allegedly acquired as the result of undue influence was denied and dismissed, as was appellants' claim for breach of fiduciary duty and removal of trustees. The trial court found that Leon abdicated his duties as joint trustee and that there was no economic harm arising out of the creation and administration of the Trust. Finally, the trial court dismissed appellants' complaints for defamation and outrage and denied and dismissed the request for injunctive relief.[1] Appellants filed a timely notice of appeal, and this appeal followed.

## II. *Standard of Review*

The exclusive jurisdiction in cases involving trusts, and the construction, interpretation, and operation of trusts are matters within the jurisdiction of the courts of equity. *Rose v. Rose*, 2013 Ark. App. 256, 427 S.W.3d 698; *Winchel v. Craig*, 55 Ark. App. 373, 934 S.W.2d 946 (1996). Arkansas appellate courts have traditionally reviewed matters that sounded in equity de novo on the record with

---

[1] Appellants filed a motion to dismiss their claims of slander and outrage against James E. Johnson, Linda's husband, and Brent Johnson, Linda's son. The trial court granted this motion and included its ruling in its final order. Therefore, Brent Johnson and James E. Johnson are not listed as appellees in this matter.

respect to factual and legal questions. *Rose, supra*; *In re Ruby G. Owen Trust*, 2012 Ark. App. 381, 418 S.W.3d 421. A finding by a circuit court in an equity case will not be reversed unless it was clearly erroneous. *Id.*

*Cason v. Lambert*, 2015 Ark. App. 41, at 4, 454 S.W.3d 250, 253–54.

> [A] finding of fact by a trial court sitting in an equity case is clearly erroneous when, despite supporting evidence in the record, the appellate court viewing all the evidence is left with a definite and firm conviction that a mistake has been committed. *Id.* We also give due deference to the superior position of the chancellor or circuit court to view and judge the credibility of the witnesses. *Id.*

*In re Estate of Thompson*, 2014 Ark. 237, at 6, 434 S.W.3d 877, 881.

### III. *Shifting Burden of Proof*

Appellants argue that the trial court erred in three ways regarding its findings of mental capacity and undue influence. First, they claim that the trial court erred in failing to shift the burden of proof to appellees. This court has stated,

> Ordinarily, the party challenging the validity of a will is required to prove by a preponderance of the evidence that the testator lacked mental capacity or was unduly influenced at the time the will was executed. *Bell v. Hutchins*, 100 Ark. App. 308, 268 S.W.3d 358 (2007). But in a case where a beneficiary procures the making of a will, a rebuttable presumption of undue influence arises that places on the beneficiary the burden of proving beyond a reasonable doubt that the testator enjoyed both required mental capacity and freedom of will. *Pyle v. Sayers*, 72 Ark. App. 207, 34 S.W.3d 786 (2000).

*Harbur v. O'Neal*, 2014 Ark. App. 119, at 5, 432 S.W.3d 651, 656.

Appellants claim that appellees procured the creation of the Trust without informing appellants or the other brothers. They contend that this procurement was in contradiction to the prior actions of the family regarding Zoe's estate planning. Appellants contend that the Trust enriches appellees with property that they would not otherwise have had a stake in—159 acres belonging to Farris. Therefore, appellants contend that the trial court clearly erred in not shifting the burden of proof to appellees to overcome beyond a reasonable

doubt the rebuttable presumption of undue influence and lack of mental capacity. Appellees argue that the trial court did shift the burden of proof, concluding that they overcame the rebuttable presumption that Zoe was unduly influenced and did not have the requisite mental capacity to execute her trust and deeds as required by law.

However, we hold that appellants' argument is not preserved for appellate review. Appellants did not claim at trial that appellees had the burden to prove beyond a reasonable doubt Zoe's mental capacity and the lack of undue influence. In their argument before this court, appellants stated, "There was no finding by the trial court that the [appellees] had overcame beyond a reasonable doubt the rebuttable presumption of undue influence." In Arkansas, it is a well-settled rule that issues not raised or ruled on in the circuit court will not be considered for the first time on appeal. *See Wilson v. Lindvall*, 2013 Ark. App. 364, at 2, 428 S.W.3d 532, 533 (where appellants failed to preserve for appeal their argument concerning procurement and shifting of the burden of proof as it was not presented nor ruled on by the circuit court); *Foster v. Foster*, 2010 Ark. App. 594, 377 S.W.3d 497 (where the issue of procurement was not preserved for review because it was not raised at trial).

## IV. *Mental Capacity*

Second, appellants claim that the trial court's findings regarding mental capacity were clearly against the preponderance of the evidence. This court stated,

> The requisite level of mental capacity to create a trust is defined as having "sufficient mental capacity to retain in his memory, without promptings, the extent and condition of his property, and to comprehend how he is disposing of it, and to whom." *Rose [v. Dunn]*, 284 Ark. [42,] at 46, 679 S.W.2d [180,] at 182.

*Harbur v. O'Neal*, 2014 Ark. App. 119, at 6, 432 S.W.3d 651, 656.

Appellants contend that the evidence presented shows that Zoe did not have the requisite mental capacity to execute the trust. They rely on their expert's opinion as a certified legal nurse consultant that, based on medical records, Zoe's short-term and situational memory were both impaired on December 29–31, 2009. Appellants also point to Leon's testimony that Zoe was disoriented when the parties celebrated Christmas, as indicated by Zoe's confusion over the grandchildren opening gifts that she thought were for her, despite her earlier instruction to Leon to buy gifts, from her, for the grandchildren. Appellants also contend that Zoe's hearing and visual impairments were apparent. She stated during the videotaped execution of the Trust that Linda and Garry were listening for her. Appellants point to nine instances during the videotaped signing where they contend that Zoe demonstrated her inability to hear or comprehend. Appellants also rely on the evidence of Zoe's having macular degeneration, which impaired her vision. Appellants contend that Zoe's diminished cognitive functioning, compounded by her inability to hear and see, precluded her from comprehending what was occurring when she executed the Trust or demonstrating that she knew the extent of her property.

In contrast, appellees contend that the trial court's finding that Zoe had the mental capacity to execute her trust and deed documents was not against the preponderance of the evidence. They note the evidence that Zoe directed Linda to contact the lawyer for purposes of preparing the Trust and related documents. Appellees contend that the videotaped recording of the execution of the Trust reflects that Zoe acknowledged the attorney's verbal listing of her assets. Appellees maintain that the Trust and Zoe's previous Will both divided her assets equally among her six children, and neither appellee gained any

advantage over the other siblings as a result of the trust. Appellees contend that, despite her hearing deficit and macular degeneration, their expert stated that the videotape reflected that Zoe was engaged and had understanding, and it was his opinion that Zoe was competent to execute the Trust and deed documents. Finally, appellees point to the attorney's testimony that Zoe spontaneously asked him what would happen if Leon refused to act as trustee, and this solidified in his mind that Zoe was competent. Accordingly, based on our de novo review, and giving due deference to the superior position of the circuit court to view and judge the credibility of the witnesses, we hold that the trial court's finding that Zoe possessed the requisite capacity to execute the Trust was not clearly erroneous.

## V. *Undue Influence*

Third, appellants contend that the trial court's findings of no undue influence were clearly against the preponderance of the evidence. This court stated,

> The definition of "undue influence," on the other hand, is influence "such as results from fear, coercion, or any other cause that deprives the testator of his free agency in the disposition of his property." *Rose*, 284 Ark. at 45, 679 S.W.2d at 182.

*Harbur*, *supra*, 2014 Ark. App. 119, at 6, 432 S.W.3d at 656–57.

Appellants contend that appellees exerted coercion or some other cause that deprived Zoe of her free agency in the disposition of her property, specifically 159 acres that they believe belonged to Farris. Appellants point to Leon's "extensive" testimony regarding appellees' efforts to exert "some other cause" over Zoe that led to her executing the Trust. They claim that appellees employed various methods to mold Zoe's mind to induce her into executing the Trust. Appellants argue that appellees had insisted that Zoe remain under the influence of her prescription medication; that Linda began having Zoe sleep in the bed

with her in order to deny appellants access to Zoe; that Linda was overheard telling Zoe that appellants were trying to steal her money; that Linda would not let anyone else stay with Zoe in the hospital; that Linda called 9-1-1 in order to have law enforcement assist with removing appellants from Zoe's home; and that Linda moved Zoe into her own home to deny appellants any opportunity to see Zoe before she passed away. Appellants maintain that appellees' actions were because they wanted a stake in the 159 acres that belonged to Farris.

However, we agree with appellees' contention that the trial court's finding of no undue influence was not against the preponderance of the evidence. Appellees garnered no advantage to themselves as a result of the trust. Zoe's assets under her Will would have been divided equally among her six children and her Trust directs that her assets be divided in such a way. Appellee Leon was named a joint trustee along with his mother and Garry. Also, Garry testified that his brothers visited Zoe later on the day she signed the Trust, and she told them about the Trust. He further testified that none of his brothers ever expressed to him that they thought Zoe was mentally incompetent. Finally, the trial court had the benefit of watching a twenty-minute video of Zoe signing the trust documents and deeds. Deference is given to the trial court to judge the credibility of witnesses. *In re Estate of Thompson*, *supra*. Accordingly, we affirm the trial court's finding that Zoe was not unduly influenced.

Affirmed.
ABRAMSON and BROWN, JJ., agree.

*Lightle, Raney, Streit & Streit, LLP*, by: *Jonathan R. Streit*, for appellants.
*Grayson & Grayson, P.A.*, by: *Melanie L. Grayson* and *Keith L. Grayson*, for appellees.