Shirley Wilson GREENWOOD, Guardian
*v.* Lillie F. WILSON, Administratrix

79-248                                                588 S.W. 2d 701

Opinion delivered November 5, 1979
(In Banc)

*J. Marvin Holman,* for appellant.

*Benny E. Swindell,* for appellee.

Darrell Hickman, Justice. The issue before us is the validity of a will. John F. Wilson signed an instrument on the morning of July 7, 1976, while a patient at St. Mary's Hospital in Russellville. That instrument, which was in the handwriting of his second wife, Lillie, left all his property to her if she survived him. Wilson died a month later.

The validity of that will was contested by the testator's first wife, Shirley Wilson Greenwood, on behalf of a minor adopted child of the first marriage.

The appellant Greenwood claimed that the instrument was invalid because of undue influence exercised by Lillie Wilson and because of Wilson's lack of mental capacity to make a will.

The Probate Court of Johnson County held the will valid. On appeal only two issues are raised: Whether the findings of the probate judge were against the preponderance of the evidence and whether the testimony of Lillie Wilson

about statements Wilson made regarding his intent were admissible. The first issue requires consideration, the second none because Uniform Rules of Evidence, Rule 803(3), permits such statements concerning present intent. See *State* v. *Abernathy,* 265 Ark. 218, 577 S.W. 2d 591 (1979).

The law to be applied to this case has been settled for years. On appeal we review the case *de novo* and will affirm the order of the probate judge unless it is against the preponderance of the evidence. *Orr* v. *Love,* 225 Ark. 505, 283 S.W. 2d 667 (1955); *Sullivant* v. *Sullivant,* 236 Ark. 95, 364 S.W. 2d 665 (1963). (Similar cases decided after July 1, 1979 will be affirmed unless the findings are clearly erroneous according to Rules of Civil Procedure, Rule 52, which is the same standard as "clearly against the preponderance of the evidence." This review criterion, however, does not affect the burden of proof that is imposed on parties in the trial of certain causes. See Note 2, Reporter's Notes to Rule 52.)

Generally, the burden of proving undue influence and the lack of mental capacity would be on the party challenging the will. *Sullivant* v. *Sullivant, supra; Orr* v. *Love, supra.* However, because this will was drafted by Lillie Wilson, the primary beneficiary, there is in effect an offsetting rule which places on her the burden to prove beyond a reasonable doubt that her husband had both the mental capacity and the freedom of will and actions required to render a will legally valid.

As early as 1858 we said in *McDaniel* v. *Crosby,* 19 Ark. 533 (1858):

When a will is written, or proved to be written by a person benefited by it, or by one standing in the relation of attorney or counsel, and who is also benefited by it, — these are circumstances to excite stricter scrutiny and require stricter proof of volition and agency.

Continuing, the Court quoted favorably from a case of another jurisdiction:

. . . it is incumbent on those, who, in such a case, seek to establish the will, to show beyond reasonable doubt,

that the testator had both such mental capacity, and such freedom of will and action, as are requisite to render a will legally valid.

That has been our rule ever since.

In *Orr* v. *Love, supra,* we approved this language and also stated:

> The presumption of undue influence is not one of law but is a presumption of fact and subject to rebuttal. . . . The question of undue influence and mental capacity are so closely interwoven that they are considered together.

In *Sullivant* v. *Sullivant, supra,* we again approved the standard of proof to be one beyond a reasonable doubt.

In the case of *Hiler* v. *Cude,* 248 Ark. 1065, 455 S.W. 2d 891 (1970), we were asked to hold that our decision in *Orr* meant that the burden of proof shifted where a proposed will is drafted by a beneficiary. That same argument is made by the appellant Greenwood. That is, normally a contestant must prove undue influence and mental incapacity; whereas a beneficiary-drawn will must be shown beyond a reasonable doubt to be free from undue influence and made by a mentally capable person.

We clearly held in *Hiler* that the burden did not shift and that the two rules did not conflict:

> We adhere to the rule that the burden of proving mental incompetency, undue influence and fraud which will defeat a will is upon the party contesting it. We hold this burden, in the sense of the ultimate risk of nonpersuasion, never shifts from the contestant. This does not however, conflict with the rule concerning the burden of going forward with the evidence or burden of evidence. As stated in 29 Am.Jur. 2d, 156, Evidence Section 125: 'In short, the burden of proof, in the sense of the ultimate risk of nonpersuasion, never shifts from the party

who has the affirmative of an issue, although the burden of going forward with the evidence may shift at various times during the trial from one side to the other as evidence is introduced by the respective parties.'

Obviously, a proponent of a will, who is a beneficiary and who drafted or caused to be drafted a will, does not enjoy the usual legal advantages given to a document otherwise drawn. For example, a person is presumed to be sane. *First Christian Church* v. *McReynolds,* 194 Or. 68, 241 P. 2d 135 (1952). Also, a proponent of a will only has to show by a preponderance of the evidence the necessary and essential matters to get a will admitted to probate. *C.J.S., Wills* § 383 *et seq.* (1957); *T. Atkinson, Wills* § 101 (2d ed. 1953).

In a will such as that before us, because proof of mental capacity and the lack of undue influence must be proved beyond a reasonable doubt, those advantages, which make it relatively easy to admit a will to probate, obviously do not exist.

It is a burden that one ought to have who is a primary beneficiary of a document drafted or caused to be drafted by that beneficiary. As we said in *McDaniel* v. *Crosby, supra,* ". . . these are circumstances to excite stricter scrutiny and require stricter proof of volition and agency."

Lillie Wilson admitted she wrote out the will because she said John Wilson's hands were shaky and he had an I.V. (intravenous tube) in his hand.

Wilson was hospitalized on July 5th for liver failure. She wrote the will on July the 6th, and it was signed on the morning of July 7th. It reads:

I, John F. Wilson being of sound mind hereby tells that this is my last will and Testamony. This is to disregard any other wills made before. To my wife Lillie F. Wilson I leave all my property 78.2 Acres more or less and personal possions. She is to be responsible for the estate of my unborn child due Sept. 1976. In the event she dies my brother Jimmy D. Wilson is to be over my childs

estate. If the child dies my nieses Deanna Wilson and Donna Wilsons will be last aires excluding 4 acres of land to my mother and Fatherinlaw — Betty Underwood shall have two acres & Charlie Woodard two acres. Jimmy D. Wilson will be in charge. This being of course if Lillie is not living. To my adopted son Antonnty Jack Wilson I leave the sum of one dollar because he has been took care of with settlements & my social security.

/s/ John F. Wilson (illegible) 7/7/76
/s/ Cheryll A. Shinn, Medical Records 7/7/76
/s/ Sharon C. Bell, Medical Records 7/7/76

There is no doubt the burden was on the appellee to prove beyond a reasonable doubt that John Wilson was not unduly influenced and that he had the mental capacity to make this will.

Undue influence has been defined this way:

As we understand the rule, the fraud and undue influence which is required to avoid a will must be directly connected with its execution. The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion, or any other cause deprives the testator of his free agency in the disposition of his property. And the influence must be specifically directed toward the object of procuring a will in favor of particular parties. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relation with them at the time of its execution. (Quoting from 3 Elliott on Evidence, § 2696): 'The influence of the husband over the wife, that of the wife over the husband, of the parents over the children, and of the children over the parents, are legitimate, so long as they do not extend to positive dictation and control over the mind of the testator.' *Puryear* v. *Puryear,* 192 Ark. 692, 700 (1936).

Mental or testamentary capacity has been uniformly defined as:

> . . . (a) the ability on the part of the testator to retain in memory without prompting the extent and condition of property to be disposed of; (b) to comprehend to whom he is giving it; and (c) to realize the deserts and relations to him of those whom he excludes from his will. *Hiler* v. *Cude, supra,* 1076.

We find the appellee did not prove beyond a reasonable doubt Wilson had the mental capacity to execute a valid will. The chancellor's findings in that regard are against the preponderance of the evidence.

Four witnesses testified for the appellee, two employees of the hospital, a doctor and the appellee, Lillie Wilson.

Lillie Wilson testified that she and John Wilson were married in February, 1975, and that she gave birth to his child in October, 1976, 55 days after Wilson's death. She said Wilson was sick and she had him admitted to the hospital on the 5th of July, 1976. He told her he wanted a will and she wrote down on a piece of paper what he told her. She talked to a lawyer the morning of the 6th and received some advice after which she drafted the will, which we have reproduced, in her own handwriting. She said she was told by the lawyer that Wilson could not be under the influence of drugs when he signed the will.

She called Dr. Ernest King and told him that her husband wanted to make a will and he could not be under the influence of drugs when he signed the will. She said the doctor replied ''O.K.'' and agreed to meet her at the hospital early the next morning. She said she arrived at 8:00 a.m. and saw a sign on the door which read, ''Withhold Wilson.'' The doctor came in about 8:30 a.m. and said he would send two secretaries to witness the signature. She said the secretaries had to come back three times because Wilson had diarrhea and was in the bathroom. She said she read the will to Wilson and he signed it.

She was not asked specifically about Wilson's mental condition.

The two secretaries testified that they both signed the document at Dr. King's request.

Cheryll Shinn, a medical transcriptionist, said she signed it sometime between 9:15 and 9:45 a.m. She said that her boss, Sharon Bell, was there and another woman whom she could not identify. She was asked:

\* \* \*

Q. Did he appear to be of sound mind at the time he signed this?

A. I really couldn't answer that.

Q. Was there anything he did or said —?

\* \* \*

A. I really couldn't answer that.

Q. Was there anything he said or did that indicated to you that he was not of sound mind?

A. No, sir.

Q. Did he appear to be under any undue influence or coercion at the time he signed this document?

A. No, sir, he did not. . . .

Shinn said she was present only two or three minutes. She testified she did ask Wilson if that was exactly what he wanted to do and he replied it was.

Sharon Bell, a medical records administrator, testified that she was present three or four minutes and could not recall *any* conversation. She could not identify the wife as being present although she thought there was another person

in the room. She said this was the only time she saw this patient.

Dr. Ernest King, who did not admit Wilson to the hospital but treated him while he was there, said Wilson was suffering from severe hepatic failure — liver failure. He said that Wilson was "acutely ill, critically ill, morbidly ill." King testified that he went to Wilson's room between 8 and 9 a.m. on the 7th of July and talked to Wilson about ten minutes. He said he did not give him a physical examination but he was satisfied that Wilson had the capacity to make a will. That is, that he knew about his property and knew what he wanted to do with it. He was not present later when the will was signed in the presence of the secretaries.

He admitted during cross-examination that Wilson was very ill the night before and had had hallucinations. Dr. King said his knowledge about Wilson's hallucinations prompted him to order a consultation with a psychiatrist for the 8th of July. He said he had seen him in the afternoon of the 6th but not during the night. He said he did not remember or "have in his information" the fact that early the morning of the 7th Wilson was walking the halls and picking bugs off the wall. He verified that Wilson was given 50 milligrams of Demerol and 50 milligrams of Visteril the morning of the 7th. Demerol is a narcotic and Visteril is a tranquilizer.

He admitted the records showed that on the morning of the 7th at 7:30 there was a note that Wilson was out of bed, walking the halls, confused and picking bugs off the bed table, in a condition that King agreed would make Wilson incapable of making a valid will. Dr. King said that he did *not think* Wilson was confused when he talked to him thirty minutes or so later.

He was asked about a nurse's written observation that at 11:00 a.m. on the morning of the 7th, Wilson was "shaking all over, continues to be confused. Dr. King notified." He agreed Wilson would not have been competent at 11:00 a.m. He said he did not remember seeing Wilson that morning; he did not think he did because he had seen him off and on for several days and this was nothing new. He said it had been

two years since the event and he could not recall any conversation that took place with Wilson on the morning of the 7th. Other doctors also attended Wilson.

Barbara Hays, a nurse who came on duty about 6:30 a.m. on the morning of the 7th, made the 7:30 a.m. note. It read:

Out of bed. Walking in halls. Confused. Picking bugs off bed table when no bugs seen by . . . personnel.

She observed this conduct personally. She confirmed that the record showed that at 5:50 a.m. on the morning of the 7th Wilson received 50 milligrams of Demerol and 50 milligrams of Visteril. She testified that the records showed that on the afternoon Wilson was admitted, which was the 5th of July, he had a convulsion. The record reflected that several times the I.V. tube had been pulled out on the 6th and 7th of July. Wilson also had a bowel movement in his bed.

She made the medical observation and note that at 11:00 a.m. on the 7th he was shaking all over and continued to be confused. She personally observed this conduct. She noted that Dr. King was notified. She made the note at 10:30 on the 8th of July that Dr. Linda Bell, a psychiatrist, was notified of a consultation. She noted that on the 9th of July he continued to be confused. On the 10th of July she made the note that Wilson was coherent when she spoke to him.

There is no doubt that Wilson, when admitted to the hospital, not only suffered from severe physical problems but also from withdrawal symptoms commonly known as the D.T.'s. One report stated that he had been using a half gallon of wine a day; another two gallons of wine a week.

Dr. Steven Bradley Finch, a specialist in psychiatry, was called as an expert witness by the appellant. His conclusion, after studying the medical reports and record, was:

A. I have formed a conclusion from my examination of the medical records. My conclusion is that this man in all likelihood was suffering from an organic psychosis as

well as his physical disorders and that this was probably related to an alcohol ingestion. It is my further opinion that between the date of admission on July the 5th until the evening of July the 9th or the morning of July the 10th, that the patient was unable to carry a stream of thought to its logical conclusion. And that his judgment was impaired to the extent that he probably could not make a logical judgment.

Reviewing the evidence, it is undisputed that Wilson suffered severely and suffered from hallucinations. A person may hallucinate without outward signs of hallucination. Dr. King admitted he was not competent at 7:30 a.m. and 11:00 a.m. according to hospital records. The great weight of the evidence is he was not mentally competent on the morning of the 7th to make a valid will.

It is possible that he had a lucid interval when he signed the will. Yet the preponderance of the evidence is otherwise. Dr. King, the only witness for appellant on mental capacity, was not present when the will was signed. Neither attesting witness nor Lillie Wilson testified positively about his mental capacity.

The medical records, the testimony of the nurse and Dr. Finch's testimony clearly demonstrate Wilson's condition.

The question must be asked then, where is the evidence beyond a reasonable doubt that Wilson had the mental capacity to make a will? It is not present. We would have to presume that Wilson was in a lucid interval, not confused or suffering from hallucinations or drugs at the precise time he signed the document. We are unwilling to make that presumption in the face of the evidence in this case.

The probate judge's findings are against the preponderance of the evidence and the cause is reversed with directions to dismiss the order admitting the will to probate.

Reversed.

HARRIS, C.J., not participating.

BYRD, J. dissents.