Michael PYLE *v.* Brian SAYERS

01-32 39 S.W.3d 774

Supreme Court of Arkansas
Opinion delivered April 5, 2001

Shackleford, Phillips, Wineland & Ratcliff, P.A., by: Michelle H. Cauley, for appellant.

John D. Lightfoot, P.L.L.C., for appellee.

W.H. "DUB" ARNOLD, Chief Justice. This case involves a will contest, with issues concerning undue influence and mental capacity. Appellant Michael Pyle appeals the order of the Union County Probate Court, finding that the will of Mabel Hammond was valid. The Arkansas Court of Appeals affirmed the decision of the probate court on December 20, 2000. *Pyle v. Sayers*, 72 Ark. App. 207, 34 S.W.3d 786 (2000). This Court subsequently accepted appellant's petition for review; hence, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(e)(ii). We, likewise, affirm the decision of the probate court.

Mabel Hammond was seventy-five years old in the summer of 1998. On May 12, 1998, she was admitted to the hospital in El Dorado. She was seen by Dr. Barry Moore, who diagnosed her as suffering from (1) depression, (2) dementia, possibly Alzheimer's disease, and (3) weight loss, possibly due to cancer. Dr. Moore determined by history that Mrs. Hammond had suffered several strokes in the past.

On May 18, 1998, Mrs. Hammond was admitted to Oak Ridge Nursing Home in El Dorado. On June 8, 1998, she executed the will in question at the nursing home. The will left her entire estate to her husband, W.A. Hammond. If her husband predeceased her, her jewelry was left to her great-niece Karen Sayers, and a great-grandniece, Sarah Sayers, with the residue of her estate to go to a great-nephew, Brian Sayers, and his wife, Rhonda Sayers, in equal shares. The following morning on June 9, 1998, Mrs. Hammond's husband died.

Mrs. Hammond left Oak Ridge Nursing Home on June 15, 1998. She died at home on June 25, 1998. Brian Sayers, the appellee here, filed a petition in Union County Probate Court to probate Mrs. Hammond's will. The petition was opposed by the appellant, Michael Pyle, on his own behalf as Mrs. Hammond's nephew and heir at law, and as guardian for his mother, Mary Pyle, the testatrix's sister.[1]

Following a hearing, the probate judge issued an extensive letter opinion finding the will to be valid. On appeal, Mr. Pyle argues that the trial court erred in not requiring appellee, as the will's proponent, to overcome the rebuttable presumption of undue influence and lack of mental capacity beyond a reasonable doubt and that the court's decision on these issues was clearly erroneous. We disagree and affirm.

## Standard of Review

■■ On a petition for review, this court reviews the case as if the appeal had originally been filed in this court. *Thompson v. State,* 342 Ark. 365, 28 S.W.3d 290 (2000); *Muhammad v. State,* 337 Ark. 291, 988 S.W.2d 17 (1999); *State v. Brunson,* 327 Ark. 567, 570, 940

---

[1] Mary Pyle did not testify at trial and there was evidence that it may have been as long as twenty years since she and Mabel Hammond had seen each other.

S.W.2d 440 (1997); *Mullinax v. State*, 327 Ark. 41, 938 S.W.2d 801 (1997). Although probate cases are reviewed *de novo* on appeal, we will reverse a probate court's determination on the questions of mental capacity and undue influence only if it is clearly erroneous, giving due deference to the superior position of the trial judge to determine the credibility of the witnesses and the weight to be accorded their testimony. *See Daley v. Boroughs*, 310 Ark. 274, 835 S.W.2d 858 (1992); *Reddoch v. Blair*, 285 Ark. 446, 688 S.W.2d 286 (1985). While our review must take into consideration that the will's proponent bore the burden of proof, or the burden of going forward with the evidence beyond a reasonable doubt, the question on appeal is not whether we have such a doubt; rather, the question on appeal is whether or not the trial court's decision was clearly erroneous. Here, we hold that it was not and affirm.

### Background Facts and Burden of Proof

In the spring of 1998, seventy-five-year-old Mabel Hammond and her husband, W. A. Hammond, were in failing health. W. A. Hammond was dying of cancer. He had been caring for his wife and managing their household affairs for several years because Mabel Hammond had not been able to care for herself. She suffered from senile dementia, possibly Alzheimer's disease, severe weight loss, depression, a bad cough (later diagnosed as related to her previously undiagnosed condition of lung cancer, which had metastasized to her liver and was terminal), and disorientation. On May 12, 1998, W.A. Hammond arranged for Mabel Hammond to be admitted to Union Medical Center in El Dorado, Arkansas, where she was treated by Dr. Barry L. Moore from May 12 to May 18, 1998. After she was discharged from the hospital, Mabel Hammond was admitted to Oak Ridge Nursing Home where she resided until discharged to her home on June 15, 1998.

On June 8, 1998, Mabel Hammond signed a will that left the majority of her estate to her great-nephew, appellee Brian Sayers, if her husband did not survive her. Her husband died the following day, June 9, 1998. Mabel Hammond died on June 25, 1998, two weeks later. She never had children, but was survived by a sister, Mary Pyle. Michael Pyle, appellant, is the guardian of the personal estate of Mary Pyle, his mother. After appellee presented the purported will to the Union County Probate Court on July 1, 1998, appellant objected to the will on three grounds: (1) that the will was procured by appellee; (2) that the will was the result of undue

influence; and (3) that Mabel Hammond lacked the testamentary capacity to execute a will.

The probate court conducted a trial on May 5 and 6, 1999, concerning the will contest. On June 1, 1999, the probate judge entered an order admitting the will to probate. The second paragraph of that order reads as follows:

> This is a will contest, specifically whether the testatrix Mabel Hammond had the requisite mental capacity and was not acting under undue influence on June 8, 1998 when she executed a will. *The issue here is mental capacity as the facts do not indicate any undue influence.*

(Emphasis added.) The same opinion also contained the following statement:

> The evidence is not controverted that Brian Sayers procured the will and benefits from its provisions. The law in Arkansas is clear that when a will is valid on its face an opponent of the will must prove by a preponderance of the evidence that the testator either lacked the mental capacity to execute a will or did so under undue influence. However, if the proponent of the will procured the will and benefits from the will then the burden of proving the will is on the proponent. The burden of proof is under those circumstances beyond a reasonable doubt.

It has long been the law in Arkansas that a party challenging the validity of a will must typically prove *by a preponderance of the evidence* that the testator lacked the requisite mental capacity or that the testator was the victim of undue influence when the will was executed. *See Greenwood v. Wilson*, 267 Ark. 68, 588 S.W.2d 701 (1979); *Sullivant v. Sullivant*, 236 Ark. 95, 364 S.W.2d 665 (1963); *Orr v. Love*, 225 Ark. 505, 283 S.W.2d 667 (1955). However, it is equally settled that when the person benefitting from the will also engages in drafting or procuring the will, a rebuttable presumption of undue influence arises and creates a burden for the proponent of the will to prove *beyond a reasonable doubt* that the testator had both the testamentary capacity as well as the freedom from undue influence to execute a valid will. *See Smith v. Welch, et al.*, 268 Ark. 510, 597 S.W.2d 593 (1980); *Short v. Stephenson*, 238 Ark. 1048, 386 S.W.2d 501 (1965); *Orr v. Love, supra; McDaniel v. Crosby*, 19 Ark. 533 (1858). This Court has often stated that the questions of testamentary capacity and undue influence are so interwoven in any case where these questions are raised that the court

necessarily considers them together, for in one case where the mind of the testator is strong and alert, the facts constituting undue influence would be required to be felt stronger than in another case, where the mind of the testator was impaired either by some inherent defect or by the consequences of disease or advancing age. *See Noland v. Noland*, 330 Ark. 660, 956 S.W.2d 173 (1997); *Short v. Stephenson, supra.*

■ It is true that every person of sound mind and disposing memory has the untrammeled right to dispose of his or her property by will as he or she pleases. *See Puryear v. Puryear*, 192 Ark. 692, 94 S.W.2d 695, 696 (1936). This means that if the maker of a will has sufficient mental capacity to retain in her memory, without prompting, the extent and condition of her property and to comprehend how she is disposing of it, to whom, and upon what consideration, then she possesses sufficient mental capacity to execute the will. *Richard v. Smith*, 235 Ark. 752, 361 S.W.2d 741 (1962). This court has frequently observed that the relevant inquiry is not the mental capacity of the testator before or after a challenged will is signed, but rather the level of capacity at the time the will was signed. *See Noland v. Noland, supra; Daley v. Boroughs, supra; Hiler v. Cude*, 248 Ark. 1065, 455 S.W.2d 891 (1970).

■ As for undue influence, this Court stated in *Orr v. Love, supra*, as follows:

> The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion or any other cause that deprives the testator of his free agency in the disposition of his property.

225 Ark at 510, 283 S.W.2d at 670. *See also In re Estate of Davidson*, 310 Ark. 639, 839 S.W.2d 214 (1992).

■ The probate court correctly recognized that the burden of proving beyond a reasonable doubt that Mabel Hammond had the mental capacity to execute the will and that she was not acting under undue influence shifted to appellee, as proponent of the will under which he was a clear beneficiary. Once appellee overcame this presumption, the burden then shifted back to appellant as a *contestant* of the will to prove by a *preponderance of the evidence* that the testator lacked the requisite mental capacity or that the testator was the victim of undue influence when the will was executed. *See Greenwood v. Wilson, supra; Sullivant v. Sullivant, supra; Orr v. Love, supra.*

■■ This Court has long held that, with respect to a will obtained by influence, it is not unlawful for a person, by honest intercession and persuasion, to procure a will in favor of himself, or another person. *McDaniel v. Crosby*, 19 Ark. 533 (1858). Whether the disposition was a natural one is a relevant inquiry. *See Boggianna v. Anderson*, 78 Ark. 420, 94 S.W. 51 (1906). The influence of children over parents is legitimate so long as they do not extend a positive dictation and control over the mind of the testator. *Greenwood v. Wilson*, 267 Ark. 68, 588 S.W.2d 701 (1979). Cases involving undue influence will frequently depend on the credibility of witnesses and, as stated above, we give due deference to the superior position of the trial judge to determine the credibility of the witnesses and the weight to be accorded their testimony. *See Daley v. Boroughs, supra; Reddoch v. Blair, supra.*

From our review of this case, we find no evidence of error on the part of the trial court. The evidence offered by Brian Sayers in support of meeting his burden of proof was the following testimony. Karen Richards testified that she was Brian Sayers' sister and Mabel Hammond's great-niece. She testified that she and Brian moved in with Mrs. Hammond when she was twelve and Brian was eight or nine. She visited her in the nursing home two weeks before her death and testified that Mrs. Hammond recognized her. She also recognized Karen Richards's son, Jace, although she had not seen him in five years.

Mrs. Richards testified that Mrs. Hammond was physically withered and had not been eating right. She testified that Mrs. Hammond's mental capacity was about the same as it had been five years previously although she was very tired and did not speak as much. She testified that her great-aunt was closer to Brian than any of them because he had come to her house at a younger age than the rest. Mrs. Richards was a psychiatric registered nurse and testified that she thought Mrs. Hammond was of sound mind.

Edwin Gogo was a registered nurse at Oak Ridge Nursing Home. He testified that Mrs. Hammond was oriented to herself and some family members. He said that Mrs. Hammond always told him that Brian Sayers was her son. He testified that Mrs. Hammond was only disoriented at nighttime and described that as the "sundown syndrome."

Donna Rainey was the social services director at Oak Ridge Nursing Home. She testified that Mrs. Hammond was very frail and weak. She said that Mrs. Hammond's husband had been taking care

of her at home and that they were both sick. She testified that Mrs. Hammond realized they were both terminally ill and said that she did not think she could stay at home and watch him die.

Mrs. Rainey testified that Mrs. Hammond knew what she wanted and that she was "very clear in those regards." She testified that Brian was there everyday. She said, "I think Mrs. Hammond knew her own mind as far as what she wanted." She testified that Mrs. Hammond called Brian Sayers her son.

Diane Beeson was a LPN at Oak Ridge Nursing Home. She testified that Mrs. Hammond was alert and knew herself and family. She said that Mrs. Hammond knew she was in the hospital and nursing home, but she did not know where.

Angela Oles was a supervising registered nurse at Oak Ridge Nursing Home. She testified that Mrs. Hammond was a terminal-stage, medicare patient who had a poor appetite. She testified that at the time Mrs. Hammond signed a living will proxy, she knew what she was doing. She also testified that Mrs. Hammond always referred to Brian Sayers as her son. Charles L. Massey was a licensed practical nurse at Oak Ridge Nursing Home. He testified that Mrs. Hammond was a thin, frail little lady. He testified that when Brian Sayers would come into her room she would smile.

Jennifer Hughes was employed at Dr. Rick Brown's office and was asked by Lily Gregory, a co-worker, to witness Mrs. Hammond's will. She testified that she did not get the impression that anything was being forced upon Mrs. Hammond. She testified that Brian Sayers read the will aloud to her and that she asked certain questions about how the will was drafted. Mrs. Hughes testified that she was satisfied of Mrs. Hammond's competence when she signed and witnessed the will and that, in her opinion, Mrs. Hammond understood what she was signing.

Lily Ann Gregory testified that she also worked for Dr. Brown in El Dorado and that she had known Mr. and Mrs. Hammond over a period of approximately twenty years. She testified that she had heard Mrs. Hammond refer to Brian as her child and she would not be surprised that if, in the nursing home, Mrs. Hammond referred to him that way. She testified that Mrs. Hammond recognized her when she came into the room although she had not seen her for a couple of years. She testified that she had no question as to Mrs. Hammond's competence at the moment she initialed and signed the will.

Mary Breshears testified that she had known Mabel Hammond since 1982 and that she had referred to Brian Sayers as her son. She testified that she never detected anything that concerned her about the soundness of Mrs. Hammond's mind during her stay in the nursing home.

Brian Sayers testified that Mabel Hammond was his great-aunt and that he had come to live with her in the fourth grade and had lived with her ever since. He believed he had been adopted by her. He testified that she said some things that caused him to ask her if she wanted a will, and she said that she did. He testified that there was no doubt in his mind that the will was understood by her and expressed her wishes. He testified:

> I am not going to say that auntie wasn't very frail, and not all of the time was she quite as sharp as she always was. But never at one time can I remember did auntie not know what was going on, what was being talked to her, or what we were discussing.

He testified that she had no other heirs who had made contact with her in the last ten or twenty years that he could remember.

To rebut this testimony, appellant Michael Pyle offered the testimony of Dr. Barry Moore. Dr. Moore testified that Brian Sayers was taking care of Mrs. Hammond daily. He expressed his opinion "to a reasonable degree of medical certainty" as to whether Mrs. Hammond would have had sufficient mental capacity on the day of the execution of the will to understand without prompting the natural "recipients" of her bounty. He said that she lacked such capacity. He testified that it was his understanding that a person must be "oriented to time, place and person." It must be noted, however, that Dr. Moore only examined Mrs. Hammond one time between the date she entered the nursing home on May 18, 1998, and the day she died on June 25, 1998.

It seems apparent that what the nursing home personnel meant when they testified that Mrs. Hammond was "confused as to time and place" is clearly explained in Mr. Gogo's testimony. He said, "If I were in front of Mrs. Hammond now and asked her the time and she said twelve noon and the time was actually 11:15 a.m., I would have entered that as confused as to exact time. If a family member had asked her if she knew where she was, and she said she is in the nursing home, I can say she is disoriented as to the exact place."

 The testimony offered by appellee, as the proponent of the will, and the other witnesses of the will is sufficient, if believed, to establish that Mrs. Hammond was competent to execute the will and that the will was not the product of undue influence. The trial court was entitled to credit the testimony of these witnesses in finding that Brian Sayers met his burden of proof beyond a reasonable doubt. Once the burden then shifted back to appellant, he offered no additional evidence other than the testimony of Dr. Moore, which failed to show Mrs. Hammond's mental status when she executed the will, thus giving the trial court good reason to reject as being relevant. We, therefore, hold that the trial court was not clearly erroneous in finding that appellant failed to meet his burden of proof.

Affirmed.