--------
N. MARK KLAPPENBACH, Judge *918 Carolyn Moore and Randall Sullivan filed a will contest alleging that their father, Charles Sullivan, lacked testamentary capacity to execute his will dated March 24, 2009. The Faulkner County Circuit Court found that the will was valid and denied the petition. Moore now appeals, and we affirm.
Charles executed three wills in his lifetime on June 24, 1999; March 24, 2009; and January 6, 2010. Charles died in February 2010 at the age of ninety-four. In February 2013, the Faulkner County Circuit Court entered an order granting the complaint of Carolyn and Randall to set aside a deed executed on the same date as Charles's 2010 will on the basis of Charles's mental incapacity.[1] In June 2013, Charles's wife Jewell filed a petition to have Charles's 2009 will admitted to probate. Carolyn and Randall filed their contest to the 2009 will in July 2013, alleging that Charles lacked testamentary capacity and was subjected to undue influence. Randall died in September 2013.
At the 2016 trial in this matter, the evidence established that Charles's 1999 will divided his real property between his three children as follows: approximately sixty acres to Randall, eighty acres to Carolyn, and eighty-seven acres to daughter Charlene Swaims. The will also bequeathed Charles's farm tools, implements, and equipment to Randall. The 2009 will changed Randall's distribution to a life estate with the remainder interest going to Randall's daughter. Carolyn's interest remained the same, except the north ten acres of her parcel were distributed to Charlene. Charlene was also bequeathed the farm tools, implements, and equipment.
Carolyn testified that Charles's signature on his 2009 will looked like someone was helping him sign his name. She said that in 2007 or 2008, she asked her father to let her see what he intended each child to inherit, but Jewell would not show it to her. She believed this was related to her inheritance being reduced by ten acres. Carolyn said that she asked her father's lawyer, Bill Adkisson, to see the will in September 2009, and Adkisson told her that the will was not what Charles wanted but he could not do anything about it.
On cross-examination, Jewell was questioned about symptoms she reported that Charles had experienced to a doctor at St. Vincent in March 2009. She said that she did not remember reporting what was put in the medical notes from a March 20 doctor's visit, including references to impaired decision-making and changes in personality. Jewell said that she talked to one doctor about Charles being paranoid and having hallucinations, but the doctor said it was caused by the medication Charles was taking and it cleared up after the doctor took him off that medication. She denied that Charles had depression and said that he was just very unhappy that he could not work like he used to.
Dr. Gene Frantz, an allergist, testified that Charles was his patient for more than twenty-three years and that he saw him several times a year in his latter years due to problems including allergic rhinitis, asthma, recurrent pneumonia, bronchitis, and acute infections. These visits included one in February 2009, one on March 11, 2009, in which he gave Charles some antibiotics, and one in August 2009. Charles was on persistent medications for asthma and was intermittently on antibiotics and occasionally on steroids because of the severity of his pneumonia and resulting labored breathing. Dr. Frantz said that he never questioned Charles's capacity, never noticed any cognitive issues, and did not recall Charles ever giving him unclear answers. Dr. Frantz said that he communicated directly with Charles, and Charles never had issues explaining himself and his current health, although Charles would occasionally ask Jewell about a timeline or the date something had happened. Dr. Frantz said that he would have documented it if Charles was confused or had problems communicating what was going on. He said that he referred them to a gerontologist when Jewell asked his advice on age-related issues.
When asked on cross-examination about references to memory problems, confusion, and depression in Charles's St. Vincent medical records, Dr. Frantz said that he never observed these issues with Charles. He noted that two or three weeks can make a tremendous difference in the health of a person Charles's age. He said that illnesses such as a urinary tract infection can cause people that age to get tremendously confused and that pneumonia with decreased oxygen saturation, which he said was very likely for Charles, could also explain confusion. Dr. Frantz agreed that cognition could change in a matter of two or three days.
Freida Farmer testified that Charles was at church every Sunday and Wednesday around March 2009 and that he did not stop attending regularly until November 2009. She said that she never saw him not recognize her or other people and that he was an active participant in Bible study.
Although probate cases are reviewed de novo on appeal, we will reverse a probate court's determination on the questions of mental capacity and undue influence only if it is clearly erroneous, giving due deference to the superior position of the circuit court to determine the credibility of the witnesses and the weight to be accorded their testimony. Pyle v. Sayers , 344 Ark. 354, 39 S.W.3d 774 (2001). Although Carolyn contends that the circuit court made no factual findings upon which to apply the clearly erroneous standard, our courts have long held that in the absence of a showing to the contrary, we presume that the circuit court acted properly and made such findings of fact as were necessary to support its judgment. Curry v. Pope Cty. Equalization Bd. , 2011 Ark. 408, 385 S.W.3d 130 (citing Morgan v. Stocks , 197 Ark. 368, 122 S.W.2d 953 (1938) ). Here, because the circuit court found that the will was valid, we presume that the court found that Charles had the requisite testamentary capacity.
It has long been the law in Arkansas that a party challenging the validity of a will must typically prove by a preponderance of the evidence that the testator lacked the requisite mental capacity or that the testator was the victim of undue influence when the will was executed. Pyle, supra. If the maker of a will has sufficient mental capacity to retain in her memory, without prompting, the extent and condition of her property and to comprehend how she is disposing of it, to whom, and upon what consideration, then she possesses sufficient mental capacity to execute the will. Id. The relevant inquiry is not the mental capacity of the testator before or after a challenged will is signed, but rather the level of capacity at the time the will was signed. Id. A testator's age, physical incapacity, and partial eclipse of mind will not invalidate a will if the testator has the requisite testamentary capacity when the will is executed, also known as a lucid interval. Breckenridge v. Breckenridge , 2010 Ark. App. 277, 375 S.W.3d 651.
Carolyn argues that Jewell's and Charlene's testimony that Charles remained mentally sharp until his death was refuted by the fact that his 2010 deed was later set aside due to lack of mental capacity and by his symptoms reported in his doctor's visit on March 20, 2009, four days before the execution of the will at issue. The medical records from that date state that Charles presented with "visual hallucination about 3 weeks ago which has resolved" and "memory problems, confusion for about 1 year now." When Charles was screened regarding specific symptoms, either he or Jewell reported depressive symptoms as well as trouble recalling names and faces, getting lost in familiar places, losing his train of thought, repeating himself, and impaired decision-making, among other things. Carolyn contends that the testimony from friends and neighbors *922 regarding their interactions with Charles in and around 2009 supports the medical evidence of impairment.
Although there was certainly some evidence of memory and confusion problems, there was no testimony from the doctor who saw Charles on March 20 who could have testified to the extent or severity of his symptoms on that date and whether the symptoms fluctuated day-to-day. Dr. Frantz, on the other hand, who had been Charles's doctor for years, testified that he did not notice any cognitive issues with Charles on March 11 or any other time. He noted that cognition can change in a matter of days and that some physical illnesses can cause confusion problems. The notes from Charles's next visit at St. Vincent on April 15, 2009, stated that he had improved from his last visit and his "mentation is clearer."
In addition to the testimony of Jewell and Charlene, Bill Adkisson testified that Charles was competent on March 24, 2009. Carolyn contends that his opinion should be afforded little weight because Adkisson was unaware of Charles's symptoms, could not remember the execution of the will, and believed Charles was competent to execute the 2010 deed later set aside by the court. However, Adkisson did recall some specifics regarding Charles's reasons for changing his will, and the fact that he did not perceive cognitive issues lends support to a finding that Charles was competent on that day. As we stated in Breckenridge , supra , in finding that the testator experienced a lucid interval at the time the will was executed, the circuit court was allowed to credit the testimony of the witnesses who saw the testator on the day the will was executed. Giving proper deference to the circuit court's weighing of the credibility of the witnesses, we cannot say that the circuit court's ruling is clearly erroneous. Accordingly, we affirm.
Affirmed.
This order was later affirmed by the court of appeals in February 2014. See Clegg v. Sullivan , 2014 Ark. App. 143, 2014 WL 792029.